## LONDNER v. PERLMAN et al.

(Supreme Court, Appellate Division, First Department. December 11, 1908.)

1. MORTGAGES (§ 159*)—PRIORITY—SUBORDINATION AGREEMENT.
    An agreement between the vendor of land and the purchasers provided for purchase money mortgages, and recited that, as it had been agreed between the parties that the purchase money mortgages be subordinated to mortgages which the purchasers might make to secure the building loans, the vendor agreed that when the building loan mortgages should be executed he would deliver an instrument subordinating the purchase money mortgages to the building loan mortgages. *Held* that, though it would have been the vendor's duty, if called upon, to execute a further subordination agreement, it was not necessary to make the subordination effective, as the original agreement was a present agreement for subordination, and, as the further agreement was not to be furnished until mortgages were executed, it was the apparent intention of the parties that the original agreement was to be used in effecting the loans.
    [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 312, 330; Dec. Dig. § 159.*]

2. MORTGAGES (§ 159*)—PRIORITY—SUBORDINATION AGREEMENT—RIGHTS OF SUBSEQUENT MORTGAGEES.
    It was not necessary, in order to subordinate the purchase money mortgages, that the makers of the building loans should be directly parties to the agreement to subordinate.
    [Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 312, 330; Dec. Dig. § 159.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MORTGAGES (§ 159*)—PRIORITY—SUBORDINATION.

　　Money having been advanced in good faith on building loan mortgages in reliance on an agreement of the vendor of the premises that his purchase money mortgages should be subordinated to the building loans when made, the vendor and any one claiming under him was estopped to repudiate it, and conditions arising between the vendor and purchasers, subsequent to the execution of the agreement and uncommunicated to and unknown by the lender at the time of making the building loan, would not affect its rights to priority.

　　[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 312, 330; Dec. Dig. § 159.*]

4. MORTGAGES (§ 159*)—CONSTRUCTION OF LOAN AGREEMENT—PRIORITY.

　　A building loan agreement provided that no payments should be made upon the building loan while any lien was recorded against the property, whether superior or subordinate to the building loan mortgages, but that the mortgages then existing on the premises (including a purchase money mortgage) should not be deemed liens within the terms of the agreement, which would prevent a payment to the mortgagee, but that the payments should be made subject to the aforesaid liens. *Held*, that it was a provision that existing mortgages should not be deemed liens which would prevent payments on account of the loan, and did not show an intention of the lender not to avail itself of an agreement between the vendor and purchasers of the property to subordinate the purchase money mortgage to the building loan mortgage.

　　[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 312, 330; Dec. Dig. § 159.*]

　　Ingraham and Laughlin, JJ., dissenting.

　　Appeal from Special Term, New York County.

　　Action by Isidore Londner against David Perlman and others to foreclose a mortgage. Judgment for defendants, and plaintiff appeals. Affirmed.

　　Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

　　Henry Necarsulmer, for appellant.
　　Benjamin N. Cardozo, for respondents.

　　SCOTT, J.　The facts upon which this controversy arises have been so fully stated by Mr. Justice INGRAHAM that it will be unnecessary to restate them. The subordination clause in the agreement between Perlman and Bernikow and Bernheimer was absolute and unconditional. The State Bank, or any other lender advancing money upon a building loan, was entitled to rely upon the promise therein contained. It would have been Bernheimer's duty, if called upon, to execute a subordination agreement; but in my opinion it was not necessary that he should do so in order to make the subordination effective. The agreement, in this regard, after providing for the purchase money mortgages to be given to Bernheimer, proceeds as follows:

　　"Whereas, the sellers [Perlman and Bernikow] contemplate obtaining building loans to be secured by mortgage upon the various lots of land covered by said purchase money mortgages, and it has been agreed between the parties that the said purchase money mortgages of $75,340 shall be subordinated to mortgages which the sellers may place upon said premises to secure payment of said building loans, the purchaser hereby agrees that at the time of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

execution by the sellers of said building loan and building loan mortgages he will, upon request, execute and deliver to the sellers an instrument in writing subordinating said purchase money mortgages to the lien of such building loan mortgage or mortgages."

There follows an alternative provision for the satisfaction of the purchase money mortgages, and the re-execution of other mortgages of like terms and effect, but subsequent and subordinate to the building loan mortgages. It will be seen that this clause recites a present agreement for subordination, coupled with a promise, if requested, to execute a further subordination agreement by way of further assurance, which further agreement is to be made, not when the building loan agreement is negotiated, but at the time of the execution of the building loan mortgage. It is perfectly evident that the clause was inserted in the agreement for the express purpose of facilitating the efforts of Perlman and Bernikow to obtain a building loan, and it must therefore have been within the contemplation of the parties that the agreement should be exhibited to prospective lenders of the contemplated building loan. It was not necessary that the State Bank, or any other maker of a building loan, should be directly a party to the agreement to subordinate. Rose v. Provident Loan Ass'n, 28 Ind. App. 25, 62 N. E. 293; Cummings v. Consolidated Mineral Water Co., 27 R. I. 195, 61 Atl. 353. It is made perfectly clear by the evidence that the subordination clause was exhibited to the State Bank, and that it made the building loan in reliance upon it and upon the promise of Perlman and Bernikow that they could obtain from Bernheimer a further agreement such as he had promised that he would execute upon demand. We have therefore presented upon uncontradicted evidence the case of a mortgagee who has in terms agreed to subordinate his mortgage to any building loan mortgage which should be executed, and the making of a building loan upon the faith of that agreement. The right of the mortgage to the State Bank to a priority over the purchase money mortgage is referable to and founded upon that agreement, which became effectual in equity when the building loan moneys were in good faith advanced in reliance upon it, and subsequent conditions, uncommunicated to and unknown by the bank, cannot alter that situation. Upon the plainest principles of equity Bernheimer, or any one claiming under him, is now estopped from repudiating this agreement. He put it in the power of Perlman and Bernikow to borrow money upon a building loan upon the faith of his promise to subordinate his purchase money mortgages, and cannot now be heard to repudiate his agreement. The principle underlying this rule has frequently been applied. Jackson v. Nicol, 23 App. Div. 139, 48 N. Y. Supp. 974; Am. Exch. Nat. Bank v. Woodlawn Cemetery, 120 App. Div. 119–129, 105 N. Y. Supp. 305; McNeil v. Tenth Nat. Bank, 46 N. Y. 325, 7 Am. Rep. 341.

That Bernheimer did not execute a further subordinate agreement with especial reference to the loan of the State Bank is entirely immaterial. It was his duty to have done so, if called upon, for he had so agreed, and he cannot now repudiate his agreement, upon

which the State Bank relied, by pleading that he failed or refused to do what he was legally bound to do. As I view it, therefore, the purchase money mortgage to Bernheimer became in fact and in law subordinate to the building loan mortgage to the State Bank, at the moment that the latter mortgage was executed in reliance upon the agreement that it should be so subordinated. After that it no longer lay within the power of Bernheimer, or of Perlman and Bernikow, or of all three, without the consent of the State Bank, to disturb the right of priority that had already vested in the mortgage given to it. Hence the subsequent agreement between Bernheimer and Perlman and Bernikow to cancel the agreement which comprised within its lines the subordination agreement, however effective for any other purpose, could not affect the established priority of the building loan mortgage. The numerous defaults alleged against Perlman and Bernikow in the fulfillment of their contract with Bernheimer are unavailing to defeat the priority of the loan by the State Bank. It is, of course, well settled that, when a subordinate agreement is expressly made subject to the performance of conditions, it will not become effective unless the conditions are fulfilled. But that is not this case.

The agreement which included the subordination clause was a very long one, covering in great detail provisions for erecting houses and reconveying them to Bernheimer. But the fulfillment of these provisions of the contract were not made conditions of a subordination, and in the nature of things could not have been, for the procurement of a building loan was a necessary and anticipated prerequisite to carrying out the contract. Furthermore, when the loan from the State Bank was procured Perlman and Bernikow were not in default, for the time for fulfillment had not yet arrived. If they were then in default in paying the interest upon the purchase money mortgages, the State Bank had no means of knowing that fact, and Bernheimer's easy and obvious remedy was to foreclose his mortgages. It is true that at this time Perlman and Bernikow were so far behindhand in the performance of their contract that Bernheimer was reasonably justified in believing that they would be unable to complete, and it may be that he would then have been justified in rescinding his contract with them and refusing to go on with it. But he did not do so. On the contrary, he elected to keep it alive until long after the State Bank had made its loan and had acquired the right of priority over the purchase money mortgage.

Much stress is laid upon the clause in the building loan agreement (but not in the mortgage) that:

"The mortgages aggregating $58,000 now existing on said premises are not to be deemed liens under the terms of this agreement, which are to prevent a payment to the party of the second part, but said payments are to be made subject to the aforesaid liens."

It is argued that, as the $58,000 included the purchase money mortgage, this clause indicated that the State Bank did not intend or expect to avail itself of Bernheimer's agreement to subordinate his mortgage. I do not so understand it. The clause above quoted must

be read in connection with those immediately preceding it, which in effect provide that no payments shall be made upon the building loan while any lien was recorded against the property, whether superior or subordinate to the building loan mortgage. All that was intended was to provide that existing mortgages should not be considered as liens which should prevent payments on account of the loan. For these reasons I am unable to find merit in the appeal.

The judgment should be affirmed, with costs.

PATTERSON, P. J., and CLARKE, J., concur.

INGRAHAM, J. (dissenting). This action was to foreclose a mortgage on real property made by the defendants Perlman and Bernikow to secure the payment of a bond by which the mortgagors were to pay the sum of $25,113.33 on the 1st day of June, 1906, with interest thereon. The defendant the State Bank was made a party defendant, as claiming some interest or lien upon the premises covered by the said mortgage which accrued subsequent to the lien of the said mortgage and was subject and subordinate thereto. The State Bank answered, alleging that a certain mortgage executed by the Portland Realty Company, to whom the mortgaged premises had been conveyed, dated April 12, 1906, to secure the payment of $88,000, was by virtue of an agreement between Bernheimer and Perlman and Bernikow, the parties to the mortgage in suit, a prior lien to the plaintiff's mortgage, and the plaintiff's mortgage subordinate thereto, and demanding judgment that the plaintiff be compelled to execute an agreement subordinating the lien of the mortgage in suit to the lien of the mortgage held by the defendant the State Bank, and have such other judgment or relief in the premises as may be proper. The plaintiff replied to this counterclaim, and upon the trial the court found in favor of the defendant the State Bank, and subordinated the plaintiff's mortgage to the mortgage held by it; and from the judgment entered upon that decision the plaintiff appeals.

The facts upon which this controversy arose are as follows: Bernheimer was the owner of certain unimproved real property, consisting of three parcels of land—one parcel on 176th street, one parcel on the south side of 177th street, and one parcel on the northerly side of 177th street, the premises in question. By a contract dated June 8, 1905, Bernheimer agreed to sell these three pieces of property to the defendants Perlman and Bernikow for $200,000. The property was to be conveyed subject to mortgages aggregating $114,-660; $75,340 to be paid by the purchasers executing to Bernheimer three separate purchase money mortgages, each covering one of the parcels conveyed, each mortgage to be for $25,113.33—one of these mortgages being the mortgage sought to be foreclosed in this action, and covering the parcel of land on the northerly side of 177th street—and the balance of the $200,000 was to be paid in cash at the time of the closing of the contract, on June 20, 1905. On June 20, 1905, Bernheimer conveyed the property to Perlman and Bernikow, and received back from them three mortgages provided for in the contract. The mortgage in suit was assigned by Bernheimer to one Lilienthal on

June 28, 1905, was reassigned by Lilienthal to Bernheimer on November 14, 1905, and was assigned by Bernheimer to the plaintiff on March 22, 1907. On the 8th of June, 1905, when the original contract for the sale of this property was made, there was another contract entered into between Perlman and Bernikow and Bernheimer, the grantor, by which it was agreed that Perlman and Bernikow should improve these three separate parcels of land by erecting thereon buildings thereinafter described and that Bernheimer should repurchase the said property so improved for $645,000; Perlman and Bernikow agreeing to erect upon the property on the northerly side of 176th street four buildings particularly described, on the parcel fronting on the south side of 177th street four other similar buildings, and on the plot of ground on the northerly side of 177th street four other buildings substantially of the same character. Bernheimer agreed to pay for these premises by taking the property subject to a first mortgage of $420,-000, second mortgages aggregating $60,000, and the balance of the purchase price to be paid in cash. The contract further provided that:

"Whereas, the sellers are to execute to the purchaser, upon the delivery of the deed to the lots of land herein described to the sellers, under the contract of sale to be executed and delivered simultaneously herewith, three purchase money mortgages to secure payment of the aggregate sum of $75,340; and whereas, the sellers contemplate obtaining building loans to be secured by mortgages on the various lots of land covered by said purchase money mortgages, and it has been agreed between the parties that the said purchase money mortgages of $75,340 shall be subordinated to mortgages which the sellers may place upon said premises to secure payment of such building loans—the purchaser hereby agrees that, at the time of the execution by the sellers of such building loans and building loan mortgages; he, the purchaser, will upon request execute and deliver to the sellers an instrument in writing subordinating said purchase money mortgages to the lien of such building loan mortgage or mortgages, or in case the same be required by the sellers that he will satisfy and discharge the said mortgages of record and take new mortgages for the same, * * * which new mortgages so to be substituted shall be subject and subordinate in lien to the lien of the said building loan mortgage."

Provisions follow limiting the amount of these building loan mortgage to the sum of $88,000 on each of the three parcels of land 170 feet in width. The agreement then provided that "nothing herein contained shall release the sellers from the payment of interest on said purchase money bonds and mortgages at the times that same becomes due and payable up to and until the breach of this contract by the purchaser" (Bernheimer) and "the sellers [Perlman and Bernikow] covenant and agree that they will have all the buildings totally completed, ready for occupancy and delivery, by June 1, 1906," and the sellers agree that, "upon receiving such payments at the times and in the manner hereinbefore provided," they would execute, acknowledge, and deliver a proper deed containing a warranty and the usual full covenants "for the conveying and assuring to him the fee simple of said premises, free and clear of all incumbrances as aforesaid," which deeds were to be delivered at the office of Manheim & Manheim, in the city of New York, on the 20th day of June, at 12 o'clock m.; and it was further agreed that:

"In case the work of construction and completion of said buildings is delayed on account of strikes or by the elements, the sellers shall have the priv-

ilege of adjourning the date of the delivery of the deed hereunder to a date not later than the 20th day of September, 1906, and in case of such delays they shall be allowed a time, not later than the 1st day of September, 1906, for the completion of said buildings, and in case of such delays in the erection of said buildings the sellers shall give notice in writing thereof to the purchaser, or to his attorney aforesaid, not later than June 1, 1906, and in case of such delays the purchaser agrees to extend the payment of said purchase money mortgage of $75,340 to a date not later than September 20, 1906."

Perlman and Bernikow entered into possession of the property and commenced the erection of these buildings. They obtained building loans on the property on 176th street and the south side of 177th street from the Commonwealth Mortgage Company, which were secured by mortgages upon the two parcels of land, and they applied and obtained from Bernheimer agreements subordinating his mortgages on these two parcels to the building loan mortgages. These mortgages seem to have been obtained on October 17, 1906. No attempt was made to obtain a building loan on the property on the northerly side of 177th street, the property in question, until April, 1906. It appears that Perlman and Bernikow started the eight buildings on the property in the block between 176th and 177th streets immediately after obtaining conveyances of the premises; but these buildings were not finished until October, 1907. I do not find it stated when the buildings on the northerly side of 177th street were commenced, and I can find no evidence that any substantial work had been done upon these buildings prior to April, 1906. In the meantime the property had been conveyed by Perlman and Bernikow to a corporation, all of the capital stock of which was owned by them. There had been constant complaints by Bernheimer of a failure of Perlman and Bernikow to comply with their contract, both as to the character of the buildings being erected and the materials used in their erection and as to the delay in proceeding with the buildings. Perlman and Bernikow had also failed to pay the interest on the purchase money mortgages given to Bernheimer, although that interest had been again and again demanded. Bernheimer during all this time appears to have been insisting upon a completion of the contract by Perlman and Bernikow.

It is quite evident, from all the testimony, that these building operations were not carried on in such a way as to enable Perlman and Bernikow to comply with their contract, or to deliver the buildings, either on the 1st of June, 1906, or by the 1st of September, 1906. Some time in the early part of April, 1906, Bernikow made an application to the defendant the State Bank to obtain a building loan of $88,000 for the purposes of erecting the four houses on the northerly side of 177th street. This agreement between Perlman and Bernikow and Bernheimer was submitted to the State Bank, and Bernikow was asked if he could obtain the subordination agreement from Bernheimer, and he said that he could, and the State Bank then accepted the loan. No inquiry was made as to the condition of the buildings, or as to whether Perlman and Bernikow had so far complied with their agreement with Bernheimer. No communication was made by the State Bank to Bernheimer. The State Bank seems to have accepted the agreement, and the assurance of Bernikow in relation to it, without inquiry or other examination. Bernikow testified that at about this

time (whether before or after the building loan agreement was actually executed does not appear) he went to Bernheimer in relation to this building loan, but was referred by Bernheimer to his attorney, Mr. Wechsler. He then saw Mr. Wechsler, and told him that they had placed a building loan with the State Bank for $22,000 on each building, that they were nearly ready to get a payment on it, and that he thought the State Bank would insist upon having a subordination agreement. To that Mr. Wechsler replied:

"We are not in a position to give you a subordination agreement, because the mortgages are assigned. Now, I don't see any reason why the State Bank shall demand a subordination agreement. The contract itself says that you have got the right to place $22,000 on each building."

Nothing else was said about the subordination agreement, and the result of this interview was not communicated to the State Bank. The bank did not subsequently ask for a subordination agreement, but advanced the money on the mortgage without further inquiry. After that Perlman and Bernikow went on with the buildings until some time in July, when they stopped work. In August, 1906, the eight buildings first commenced were inclosed, the floors were laid, and the partitions were in place. The four buildings upon the premises in question were inclosed. It was then not possible to complete the buildings by September 20th. The building loan agreement with the State Bank, made between the Portland Realty Company, a corporation organized by Perlman and Bernikow, to whom they had conveyed the property, and one George Ricard, acting for the State Bank, recited that the Portland Realty Company was the owner of the property, and that the premises were free and clear of and from all liens and incumbrances, excepting certain mortgages, aggregating $58,000, and whereas the realty company was about to erect on the premises six-story buildings, Ricard agreeing to loan to the realty company the sum of $88,000 to aid in the erection thereof, the said sum to be paid in instalments as therein provided. The agreement further provided that, if there be any liens of record, Ricard is not required to make any payment under the agreement unless the said liens be removed. The realty company agreed to prosecute the erection of the buildings with diligence and to have the same completed on or before one year from the date of the contract, and that if there are any liens upon the property that were not removed within 10 days the full amount of the loan should become due and payable, and the mortgagee should have the right at once to foreclose, or collect the amount, with interest, in such manner as he may be advised. It is then provided that mortgages aggregating $58,000 now existing on said premises are not to be deemed liens under the terms of the agreement, but said payments are to be made subject to the aforesaid liens. Under this agreement the State Bank made advances amounting to $76,000. On August 13, 1906, Bernheimer wrote to Perlman and Bernikow, stating that he had not heard from them in relation to their delays in the construction of these buildings; that he understood from his representative that the buildings were so far behind in construction that the same could not under any circumstances be completed within the time stated in the

contract; that he would not consent to leave the matter open indefinitely; that under the circumstances he then notified them that if they were not able to deliver the building, totally completed and finished in accordance with the terms of the contract, by a day not later than September, 1906, he would then consider the contract canceled and null and void, and proceed against them for damages. The Portland Realty Company and Perlman and Bernikow then stopped work upon all of the buildings until the 18th of October, 1906, when a new agreement was made between Perlman and Bernikow and the Portland Realty Company, of the first part, and Bernheimer, of the second part. That agreement recited the making of the contract on the 8th of June, 1905; that Perlman and Bernikow and the Portland Realty Company had defaulted in the payment of principal and interest secured by the mortgages held by the plaintiff covering the premises; and that it had been agreed between the parties to cancel and annul the said contract and release each other from all liability thereunder, and Bernheimer had agreed to enter into a new contract with the realty company for the purchase of the four houses on the northerly side of 176th street, and therefore, in consideration of the premises, the parties mutually covenanted and agreed to cancel and annul the contract of sale, dated June 8, 1905, and the same was thereby canceled and annulled, and the parties mutually released and discharged each other from all claims, obligations, and liabilities of every nature whatsoever arising out of the said contract, or any of the terms and provisions therein contained. This contract was under seal, executed by Perlman and Bernikow and Bernheimer, and at the same. time a new contract was made between the Portland Realty Company and Bernheimer, by which the realty company agreed to sell to Bernheimer a plot of ground on the northerly side of 176th street, with the buildings thereon, upon certain terms and conditions named therein.

This agreement seems to have been carried out. The Portland Realty Company completed the buildings upon that piece of property some time in September or October, 1907; but nothing further has ever been done upon the buildings on the northerly side of 177th street that are involved in this action. I can find no evidence that at any time Bernheimer was ever notified of this arrangement with the State Bank, or that the State Bank had received from the Portland Realty Company a mortgage, or had made any advances to the realty company to complete this building. The evidence is undisputed that Perlman and Bernikow actually failed to complete their contract; that finally, when they were in default, they canceled and released and discharged Bernheimer from all obligation under it. The rights of the State Bank, therefore, must depend upon what it acquired upon the execution of its building loan agreement and the mortgage delivered in pursuance thereof at the time when it. was executed. Considering the agreements simultaneously made on June 8, 1905, the intention of the parties seems clear. Bernheimer was the owner of unimproved property, and upon that property Perlman and Bernikow were to erect buildings, and, when completed, convey them. to Bernheimer. Perlman and Bernikow agreed to erect the buildings and to

convey the property, with the buildings erected and finished, on the 20th of June, 1906; and to accomplish that purpose they were to obtain the building loans, to which Bernheimer's mortgages were to be subordinated, and to accomplish that result Bernheimer agreed to execute the necessary agreements to make the building loan mortgages superior to his purchase money mortgages; but the mortgagors were not released from the payment of interest on the mortgages, and to enforce the agreement as against Bernheimer they were required in good faith to carry out the agreement on their part.

The court found that it was understood between the Portland Realty Company and the State Bank that the lien of the building loan mortgage should be prior and paramount to the lien of the mortgage of the plaintiff, and that Perlman and Bernikow would procure the execution of any instruments or agreements necessary or proper to subordinate the said last-mentioned mortgage to the said building loan mortgage, and that the building loan agreement was made, and said building loan bond and mortgage were accepted, in reliance upon the said agreement between Bernheimer and Perlman and Bernikow. The court also found that at or about the time of the execution of the building loan mortgage the Portland Realty Company and Perlman and Bernikow demanded of the said Bernheimer that he execute an agreement subordinating the said purchase money mortgage to the building loan mortgage held by the State Bank, but that the said Bernheimer refused to execute such an instrument. There is nothing in the agreement between the Portland Realty Company and Ricard, acting for the State Bank, to justify this finding. That agreement recites that the premises were subject to mortgages aggregating $58,000, and it is not disputed but that the mortgage in suit was included in that amount; and it was further provided in the agreement that the payments to be made by the State Bank were to be made subject to the liens of these mortgages aggregating $58,000. This would seem to indicate an express understanding between the parties that the payments to be made by the State Bank and its lien to secure those payments were subject to the plaintiff's mortgage. It is quite true that the Bernheimer agreement was submitted to the State Bank before the mortgages were made, and that Bernikow had promised that he would obtain from Bernheimer an agreement to subordinate the Bernheimer mortgages to the mortgages of the State Bank; but there is no evidence to justify a finding that the State Bank either then understood that, without that subordination agreement, their mortgage was entitled to priority or that the State Bank at the same time understood that the agreement itself, without such new agreement from Bernheimer, was sufficient to give its mortgage a priority, and the very agreement for the building loan expressly provides that the advances that were to be made by the State Bank should be subject to the Bernheimer mortgage.

The agreement upon which the defendant the State Bank relies was one made between Bernheimer and Perlman and Bernikow. The State Bank was not a party to that agreement, had no contractual relation with Bernheimer, and there was no agreement that existed between the State Bank and Bernheimer as to this mortgage. The underlying

principle upon which a subsequent mortgagee may enforce an agreement made between third parties for his benefit is that applied in Lawrence v. Fox, 20 N. Y. 268. The application of that principle has been the subject of much discussion, and it has been limited to a strictly definite class of contracts for the benefit of third parties. Thus it is definitely settled that while the promise remains in force it must be in some way accepted by the person for whose benefit it is made. That acceptance is usually evidenced by bringing a suit upon the promise, thus adopting it and claiming its benefit. But although it is now settled that the actual commencement of an action to enforce it is not essential, still a formal acceptance and adoption of the promise by the person for whose benefit it is made during the time that the promise is in existence seems to be necessary to sustain an action upon it. The question as to what acts of the person for whose benefit the promise is made is necessary to show such acceptance and adoption is often difficult to determine. The contract between Bernheimer and Perlman and Bernikow of June 8, 1905, recites that the parties had agreed that the building loan mortgages should have a prior lien to the purchase money mortgages executed as a consideration for the sale of the property, and that promise would inure to the benefit of a person loaning money upon a building loan mortgage as provided for by that contract. The agreement between the parties being thus formally recited in the contract, although it is clear that a further subordination agreement was contemplated, would, I think, justify the court in holding that the agreement as it existed, without a formal subordination agreement, would be quite sufficient to authorize a third party, actually loaning money upon a building loan mortgage as provided in that contract, to enforce after he had duly accepted and adopted it during the time that it was in existence and enforceable between the original parties to it. But to maintain such an action it is essential that the party for whose benefit the promise was made must formally accept and adopt the promise to entitle him to recover under it. Dunning et al. v. Leavitt, 85 N. Y. 35, 39 Am. Rep. 617; Crowe v. Lewin, 95 N. Y. 423; Wheat v. Rice, 97 N. Y. 296. In Wheat v. Rice, supra, the rule is stated:

"That the destruction of the consideration of the promise in the one case, and the rescission or annulment of the contract in the other, in actions to which the alleged beneficiary was not a party, and in which he had not been heard, barred and prevented him from any right of action upon the promise. * * * There had been no acceptance or adoption by word or act. Something of that kind was essential."

Just what was essential to constitute such an acceptance or adoption of the contract was not there decided. But in Gifford v. Corrigan, 117 N. Y. 257, 22 N. E. 756, 6 L. R. A. 610, 15 Am. St. Rep. 508, the question was discussed, and speaking of Lawrence v. Fox, supra, the court said:

"The prevailing opinion in that case rested the creditor's right upon the broad proposition that the promise was made for his benefit, and therefore he might sue upon it, although privy neither to the contract nor its consideration. That view of it necessarily involves an acquisition at some moment of time of the right of action which he is permitted to enforce. If it be possible to say that he does not acquire it at the moment when the promise for

his benefit is made, it must be that he obtains it when it has come to his knowledge and he has assented to and acted upon it. For he may sue. That is decided and conceded. If he may sue, he must at that moment have a vested right of action. If it was not obtained earlier, it must have vested in him at the moment when his action was commenced, so that the right and the remedy were born at the same instant. * * * From that moment he must be assumed to act or omit to act in reliance upon it. But, if all these things occur before a suit commenced, why do they not equally vest the right of action in the assignee? What more does the mere lawsuit accomplish? And so the contract between grantor and grantee, if revocable earlier, ceases to be so when by his assent to it and adoption of it the creditor brings himself into privity with it and elects to avail himself of it, and must be assumed to have governed his conduct accordingly."

The question is thus presented in two aspects: First, at the time this building loan mortgage to the State Bank was made, had Perlman and Bernikow so far complied with the contract on their part that they would have been entitled to enforce this contract as against Bernheimer? and, second, if so, did the State Bank accept and adopt the agreement that the building loan mortgage should be prior lien to the purchase money mortgage before the cancellation of the agreement by the new contract made between Bernheimer, the Portland Realty Company, and Perlman and Bernikow? I have serious doubts whether the first question could be answered in the affirmative. After the execution of the contract, Perlman and Bernikow took possession of the premises conveyed to them, and proceeded with the erection of buildings upon them. They obtained building loan mortgages upon two of the parcels, and applied for and obtained a subordination agreement as contemplated in the original contract from Bernheimer. Under their contract they were bound to convey these completed buildings, in the absence of delays caused by strikes or the elements, of which there is no claim, on or before the 1st of June, 1906, and it was to enable them to perform this contract that the subsidiary agreement for the subordination of Bernheimer's mortgages was made. Perlman and Bernikow had agreed to pay interest on these mortgages, and had agreed to finish the buildings according to the contract and convey on the 1st of June, 1906. They had manifestly failed to comply with those provisions of the agreement; for it is quite evident, from all the testimony, that the buildings were not sufficiently advanced in April, 1906, to enable them to comply with their contract on June 1, 1906. If at that time Perlman and Bernikow had applied to Bernheimer for an agreement to subordinate the lien of his mortgage to a building loan mortgage then to be obtained, and he had refused to comply with that demand upon the ground that Perlman and Bernikow had not fulfilled their contract by erecting the buildings so as to be able to complete the contract on the 1st of June, I do not think, upon this testimony, a court of equity would have compelled him to specifically perform his contract. Bernikow testified that in August, four months later, the buildings could not have been completed for delivery by the 20th of September, and the evidence shows that the buildings upon the two other parcels of property, the construction of which were most advanced, were not completed until September, 1907, and the buildings upon the parcel in

question never were completed. I think the evidence fairly shows that from the beginning Perlman and Bernikow had never prosecuted their work so that they would have been able to complete the contract and convey the property on the 1st of June, 1906. They had failed to pay the interest; they had failed to comply with the requirements of the architect and of the contract in relation to the construction of the buildings; and it seems to me that no court of equity would have then required Bernheimer to have then subordinated the lien of his mortgages to building loan mortgages, when it was perfectly apparent from the situation that Perlman and Bernikow had not and could not complete the contract.

Assuming, however, that the situation was such as would have bound Bernheimer in April to execute a mortgage, the second question is then presented as to whether the State Bank ever accepted and adopted this agreement that Bernheimer's mortgages should be subordinated to the building loan mortgages which it gave. The only evidence we have is that, when the application was made for the building loan mortgage, the contract with Bernheimer was shown to the State Bank, and that the State Bank then said that a subordination agreement from Bernheimer would be required; that Bernikow said he could obtain, and he then made an application to Bernheimer for such a subordination agreement. That application was refused, upon the ground that Bernheimer had assigned the mortgages. Assuming that Bernikow's testimony, contradicted, as it is, by Bernheimer and his attorney, is accepted as true—and there is no express finding by the court upon this question—it seems to me to be contrary to the weight of evidence. The State Bank went on with the transaction, made no further inquiry as to an additional agreement from Bernheimer, but executed an agreement with the Portland Realty Company, Perlman and Bernikow's grantee, for this building loan mortgage. That contract itself, I think, conclusively shows that the State Bank had neither relied upon nor adopted this agreement in relation to the subordination of Bernheimer's mortgages to the lien of the mortgage to be given in accordance with it. The agreement recites that the premises are free and clear of and from all liens and incumbrances, except certain mortgages aggregating $58,000, of which the plaintiff's mortgage was one. The realty company, therefore, agreed to accept a mortgage for the advances upon premises subject to these mortgages. There was a provision in the agreement in regard to liens upon the property which would justify the State Bank in refusing to make further advances under the agreement. But it was expressly agreed that:

"The mortgages, aggregating fifty-eight thousand dollars ($58,000), now existing on said premises, are not to be deemed liens, under the terms of this agreement, which are to prevent a payment to the party of the second part; but said payments are to be made subject to the aforesaid liens."

Here was an express agreement between the parties that the mortgage of the State Bank and the payments made under it were to be subject to, not prior to, the Bernheimer mortgage, and the subsequent acts of the parties fully bear out the construction that this was

the understanding between them. When this agreement was executed, Bernikow had made an application for a subordinate agreement, which had been refused. While the State Bank was not notified of this refusal, it did not demand an execution of such an agreement by Bernheimer as a condition for making the contract, and no notice was ever given to Bernheimer that the mortgage had been obtained. Bernheimer was kept in complete ignorance of the fact that such a mortgage was in existence, and on the 30th of August following he served a notice that, as Perlman and Bernikow had failed to comply with their contract, he elected to declare it null and void. Perlman and Bernikow then stopped work upon the buildings and abandoned the contract. They made no further efforts to comply with it, and apparently acquiesced in the action of Bernheimer in declaring it abandoned. On October 18, 1906, Bernheimer entered into an agreement with Perlman and Bernikow and the Portland Realty Company which recited the contract of the 8th of June, 1905; that Perlman and Bernikow and the Portland Realty Company had defaulted in the payment of the principal and interest secured by the mortgages held by Bernheimer covering the premises mentioned and referred to in said contract; that it had been agreed upon by the parties to cancel and annul such contract and release each other from all liability thereunder; and that Bernheimer had agreed to enter into a new contract with the Portland Realty Company, bearing even date therewith, for the purchase of 4 of the 12 houses to be erected under the contract of June 12th; and in consideration of the premises the parties mutually covenanted and agreed to concel and annul the contract of sale, dated June 8, 1905, and the same was thereby canceled and annulled and made altogether null and void, and the parties mutually released and discharged each other from all claims, obligations, and liabilities of every nature whatsoever arising out of the said contract, or any of the terms and provisions therein contained. On the same day Bernheimer entered into a new contract with the Portland Realty Company, which was guaranteed by Perlman and Bernikow, for the purchase of the four buildings fronting on 176th street.

It seems to me clear that up to this time, the State Bank not having accepted and adopted the contract in relation to the subordination of Bernheimer's mortgage to the building loan mortgages that were obtained upon the premises, the State Bank's right to subsequently adopt and approve such contract was gone, and that they must be held to the terms of their contract with the Portland Realty Company, by which their mortgage was to be subject, and not superior, to the prior liens, aggregating $58,000, upon the property.

It follows, therefore, that the judgment appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

LAUGHLIN, J., concurs.