## PROVIDENCE ENGINEERING CORPORATION v. DOWNEY SHIPBUILDING CORPORATION.*

## CHASE NAT. BANK OF CITY OF NEW YORK v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION et al.

(Circuit Court of Appeals, Second Circuit. November 5, 1923.)

No. 43.

I. Corporations ⟨⇒3—Nature of "public corporation" stated.

In general, a "public corporation" is one created for a political purpose and is an instrument of the government, subject to the control of the Legislature, and its members are officers of the government appointed for the discharge of public duties.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Corporation.]

2. **Corporations ⊚⟿3—Corporation may be public, though not created for political or municipal purpose; "public corporation."**

A corporation may be "public" if created for a public purpose, although not political or municipal, if the whole interest belongs to the government, as in the case of purely public banks or a state university.

3. **United States ⊚⟿52½, New, vol. 19A Key-No. Series—Emergency Fleet Corporation distinct entity, not entitled to immunities of sovereign; "private business corporation."**

Under Act Sept. 7, 1916, as amended by Merchant Marine Act 1920, and Act June 15, 1917, the United States Shipping Board Emergency Fleet Corporation is a "private business corporation," constituting a distinct entity, and is not entitled to the immunities of the sovereign, but is liable to suit as any other private corporation upon its contract, even though it contracted as "representing the United States," in view of Act March 9, 1920.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Private Corporation.]

4. **United States ⊚⟿135—United States not "real party in interest" in mortgage foreclosure suit against Emergency Fleet Corporation.**

The United States was not the "real party in interest" in a mortgage foreclosure suit wherein the priority of mortgages given the Emergency Fleet Corporation was involved, under Act Sept. 7, 1916, as amended by Merchant Marine Act 1920, and Act June 15, 1917.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Real Party in Interest.]

5. **Evidence ⊚⟿73—Contract presumed intra vires.**

The contracts of a corporation are presumed to be intra vires, until the contrary is made to appear; the maxim omnia acta rite esse præsumuntur being applicable.

6. **Estoppel ⊚⟿62(2)—United States ⊚⟿68—Not bound or estopped by officers or agents entering into agreement not sanctioned by law.**

The United States is neither bound nor estopped by acts of its officers or agents in entering into an agreement to do or cause to be done what the law does not sanction or permit.

7. **Corporations ⊚⟿388(1)—Emergency Fleet Corporation estopped to invoke defense of ultra vires, as against innocent purchasers of bonds.**

The Emergency Fleet Corporation having the power to subordinate its mortgages for a consideration, and with the knowledge and intention that a subordination would be relied upon by innocent purchasers of bonds, secured by junior mortgage, it gave a subordination all the appearance of regularity and validity and thereby induced bondholders to purchase their bonds, it is estopped from invoking the defense of ultra vires.

8. **Corporations ⊚⟿487(1)—Plea of ultra vires unsuccessful where contract executed.**

Where a contract has been executed by both parties, corporation cannot successfully plead ultra vires to avoid the contract, provided it is not tainted by fraud or prohibited by statute or condemned by sound public policy.

Appeal from the District Court of the United States for the Eastern District of New York.

Creditors' bill by the Providence Engineering Corporation against the Downey Shipbuilding Corporation, and mortgage foreclosure suit by the Chase National Bank against the United States Shipping Board Emergency Fleet Corporation and others. From a decree, the Emergency Fleet Corporation appeals. Affirmed.

On January 7, 1921, the Providence Engineering Corporation, a corporation existing under the laws of the state of Delaware, filed in the District Court of the United States, for the Eastern District of New York, a credi-

tor's bill against the Downey Shipbuilding Corporation, hereinafter called the Downey Corporation, in which it alleged the insolvency of the latter and prayed the appointment of receivers. Thereafter the Downey Corporation answered the bill and admitted the allegations thereof. Thereupon the court named William G. Coxe, J. Ernest Allen, and William F. Purdy as receivers of the said Downey Corporation and of all its properties and assets within the Eastern District of New York, and authorized them to take possession of all such properties and assets, and also authorized them to have complete and exclusive control, possession, and custody thereof. And the receivers thereupon took possession of the property aforesaid.

Thereafter the Chase National Bank, a national banking association existing under the laws of the United States, and located in the city of New York, as trustee brought a foreclosure suit in the United States District Court for the Eastern District of New York against the Downey Corporation to foreclose two mortgages executed by the latter corporation. The first of these mortgages was for $1,500,000 and was dated December 15, 1917. The second, designated as the supplemental indenture, was dated January 2, 1920. These causes were consolidated by an order entered on July 14, 1921, and the foreclosure action was brought to trial.

The first mortgage, that of December 15, 1917, was given to the Empire Trust Company as trustee. That company resigned its trusteeship on January 28, 1920, and on the same day the Chase National Bank was substituted as trustee under that mortgage. The second mortgage, that of January 2, 1920, was given to the Chase National Bank as trustee, the complainant herein.

After execution and recording of the mortgage of 1917, and before the execution of the supplemental indenture, the Downey Corporation executed and delivered to the Fleet Corporation three mortgages covering substantially the same property as was included in the 1917 mortgage, and the Fleet Corporation recorded them. These three mortgages were dated as follows: June 14, 1918, July 30, 1919, and October 16, 1919.

It appears that after the execution and recording of the first mortgage the Downey Corporation obtained from the Fleet Corporation a letter dated January 21, 1920, signed and acknowledged by John Barton Payne as president of the Fleet Corporation, to which was affixed its corporate seal attested by its assistant secretary, consenting to the issue of $1,500,000 of bonds by the Shipbuilding Corporation under the mortgage of 1917, as supplemented by said supplemental indenture then about to be executed, and agreeing, upon request of the Shipbuilding Corporation, to execute a formal consent to subordinate the liens of the defendant's said three mortgages to the lien of said mortgage of 1917 and of said supplemental indenture. This letter of subordination and the supplemental indenture were duly recorded and all of the bonds authorized thereby were subsequently issued and sold.

The Downey Corporation commenced operations in the spring of 1917, and prior to January 1, 1920, constructed under contracts with the Fleet Corporation ten steel ships of 7,814 tons dead weight capacity. The plant of this company was located on Staten Island, with frontage on deep water, and a large production capacity both in ships and marine engines. During the fall of 1919, before the completion of its contracts with the Fleet Corporation, the Downey Corporation found itself seriously embarrassed by reason of its inability to collect from the Fleet Corporation substantial sums of money which it claimed were due and owing to it on account of the ships which had been constructed and were about to be delivered to the Fleet Corporation. Creditors, who had furnished materials and supplies actually used in the construction of these ships, had not been paid, and the company was unable to pay these and other pressing bills. And the mortgage of December 15, 1917, which concededly was a lien prior to all of the Fleet Corporation's mortgages, was in default and no provisions had been made for the payment of these notes, amounting to $750,000. The interest of the Fleet Corporation, as the holder of junior mortgages, was seriously involved.

In these circumstances the Downey Corporation approached the Fleet Corporation with the request that the Fleet Corporation subordinate the lien of its mortgages to the lien of a consolidated mortgage for $1,500,000 to enable

the Downey Corporation to refund its first mortgage notes, aggregating $750,-000, which were then in default, and to pay creditors who were in a position to assert and enforce their statutory liens against the Fleet Corporation.

This situation was fully presented to the responsible officers of the Fleet Corporation. Upon the trial of this case the counsel for the Fleet Corporation expressly disclaimed any charge that any misrepresentation had been made by the Downey Corporation in connection with the negotiations. Finally, after the most careful consideration extending over several months, at a meeting attended by representatives of the Fleet Corporation, the Downey Corporation and the bankers who subsequently purchased the new bonds and resold them to the public, a decision was reached by the representatives of the Fleet Corporation to subordinate its liens so that this refinancing might be carried through. Thereafter and prior to the execution of the supplementary mortgage, there was executed and acknowledged by the president of the Fleet Corporation and duly recorded in the land records of Richmond county the following instrument:

"January 21, 1920.

"Downey Shipbuilding Corporation, Mariner's Harbor, Staten Island, New York City—Dear Sirs: Pursuant to due corporate action taken on January 17, 1920, the undersigned, as mortgagee under three mortgages made by you, dated respectively, June 14, 1918, July 30, 1919, and October 16, 1919, and recorded respectively in the office of the clerk of Richmond county, New York, on June 17, 1918, August 2, 1919, and October 21, 1919, hereby consents that Downey Shipbuilding Corporation may issue bonds under its mortgage to Empire Trust Company as trustee, dated December 15, 1917, as supplemented by a so-called supplemental mortgage about to be executed, up to and including an aggregate principal amount of one million five hundred thousand dollars ($1,500,000). It is understood that the supplemental mortgage will be in substantially the form hereto attached.

"The undersigned will execute, upon the request of Downey Shipbuilding Corporation, a formal consent to subordinate the liens of the said mortgages of June 14, 1918, July 30, 1919, and October 16, 1919, to the lien of the mortgage of December 15, 1917, and mortgage supplemental thereto in such form and with such acknowledgment as will permit it to be recorded in the office of the clerk of the county of Richmond, state of New York.

"United States Shipping Board Emergency Fleet Corporation,
"[Seal.]              By John Barton Payne, President.
"Geoffrey Creyke, Assistant Secretary."

This instrument was properly acknowledged before a notary.

In reliance upon it and the recording thereof, the entire new issue of $1,-500,000 of bonds was purchased by Blodgett & Co., who surrendered the old issue of $750,000 of notes, which they had purchased from the prior holders thereof. In reselling these bonds the bankers represented by public advertisement, and in circulars issued to purchasers of the bonds, that these bonds were first mortgage bonds of the Downey Corporation, and further represented:

"This issue is a first, closed mortgage on land in New York City, conservatively valued by three experts at from 130 per cent. to 165 per cent. of the entire $1,500,000 bonds outstanding, while the property as a whole has been valued at over four times the amount of this bond issue.

"The mortgage securing these bonds is a first, closed lien on all the property of the corporation, now owned or hereafter acquired, described in said mortgage."

The Downey Corporation found itself unable to pay interest upon these bonds and defaulted in the payment of interest on January 1, 1921. Thereafter plaintiff, as trustee for the first mortgage bondholders, commenced this suit for the foreclosure of said mortgages, that of December 15, 1917, and the supplemental indenture dated January 2, 1920, and joined as one of the parties defendant the Fleet Corporation as the holder of junior liens.

In order to defeat the foreclosure, counsel for the Fleet Corporation now claim that its subordination agreement was ultra vires and that the defendant is not estopped from now asserting the superiority of the liens of its said three mortgages to the mortgage of 1917 and the supplemental indenture.

Claims are also made that the United States government is the real party in interest under the Fleet Corporation mortgages and that the United States is an indispensable party to this suit.

Sullivan & Cromwell, of New York City (Harlan F. Stone, of New York City, Chauncey G. Parker, of Washington, D. C., and Henry M. Ward and Paul W. McQuillen, both of New York City, of counsel), for appellant.

Simpson, Thacher & Bartlett, of New York City (Thomas D. Thacher and Louis Connick, both of New York City, of counsel), for appellee.

Cadwalader, Wickersham & Taft, of New York City (Cornelius W. Wickersham and Kenneth E. Walser, both of New York City, of counsel), for receivers.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The questions which are involved herein are three:

(1) Whether the United States is the real party in interest under the mortgages in the name of the Fleet Corporation.

(2) Whether the United States is an indispensable party to the suit.

(3) Whether the Fleet Corporation is estopped from asserting that the liens of the mortgages standing in its name are prior to the lien held by the plaintiff.

In considering these questions it becomes important to fix the status of the Fleet Corporation.

It appears that the Act of Congress of September 7, 1916, known as the Shipping Act of 1916 (Comp. St. §§ 8146a–8146r), provided for the creation of the United States Shipping Board, to be composed of five commissioners appointed by the President. That act was amended by the Merchant Marine Act of 1920 (Comp. St. Ann. Supp. 1923, § 8146b), which increased the number of commissioners to seven. The act of 1916, in section 11 (section 8146f), provided in part as follows:

"That the Board, if in its judgment such action is necessary to carry out the purposes of this act, may form under the laws of the District of Columbia one or more corporations for the purchase, construction, equipment, lease, charter, maintenance, and operation of merchant vessels in the commerce of the United States. The total capital stock thereof shall not exceed $50,000,000. The Board may, for and on behalf of the United States, subscribe to, purchase, and vote not less than a majority of the capital stock of any such corporation, and do all other things in regard thereto necessary to protect the interests of the United States and to carry out the purposes of this act."

Pursuant to that act, the Fleet Corporation was organized on April 18, 1917, under the laws of the District of Columbia.

The first article in its certificate of incorporation stated as follows:

"First. That the corporate name of this company shall be United States Shipping Board Emergency Fleet Corporation and the object for which it is formed is the purchase, construction, equipment, lease, charter, maintenance and operation of merchant vessels in the commerce of the United States and in general to do and to perform every lawful act and thing necessary or expedient to be done or performed for the efficient and profitable conduct-

ing of said business as authorized by the laws of Congress, and to have and to exercise all the powers conferred by the laws of the District of Columbia upon corporations under said subchapter four (4) of the incorporation laws of the District of Columbia."

The third article states:

"That the capital stock of this corporation shall be fifty million dollars ($50,000,000), divided into shares of the par value of one hundred ($100) each."

The fourth article named seven individuals as trustees.

It appears that the Shipping Board subscribed for the entire capital stock on behalf of the United States, and the sum of $50,000,000 was paid therefor from the treasury of the United States.

The Act of June 15, 1917 (40 St. p. 183 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115$^{1}$/$_{16}$d]), had declared:

"The President may exercise the power and authority hereby vested in him, and expend the money herein and hereafter appropriated through such agency or agencies as he shall determine from time to time: Provided, that all money turned over to the United States Shipping Board Emergency Fleet Corporation may be expended as other moneys of said corporation are now expended. * * *"

It also appears that in the bonds and mortgages involved the defendant Fleet Corporation is described as "representing the United States of America."

[1, 2] The distinction between public and private corporations is important, for the rules of law applicable to the one class of corporations are different in many respects from those which are applicable to the other. In general, a public corporation is one created for a political purpose. It is an instrument of the government, subject to the control of the Legislature, and its members are officers of the government appointed for the discharge of public duties. And a corporation may be public if created for a public purpose, although not political or municipal, if the whole interest belongs to the government, as in the case of purely public banks or a state university. But while the Fleet Corporation may have been created and controlled by the government for its own purpose, it by no means follows that such a corporation is in effect the government, and so not subject to the rules of law governing other corporations. A government, engaging in a particular business through the instrumentality of a corporation, may divest itself pro hac vice of its sovereign character, so as to render the corporation liable in the same way that a private corporation is liable. Thus in 1824 in Bank of the United States v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244, suit was brought against the Planters' Bank of Georgia in which the state of Georgia was a stockholder. The question was raised whether this circumstance gave jurisdiction to the Supreme Court as if the state were the actual party. Chief Justice Marshall, writing for the court, said:

"Is the state of Georgia a party defendant in this case? If it is, then the suit, had the Eleventh Amendment never been adopted, must have been brought in the Supreme Court of the United States. Could this court have entertained jurisdiction in the case? We think it could not. To have given the Supreme Court original jurisdiction, the state must be plaintiff or defendant, as a state, and must, as a state, be a party on the record. A suit

against the Planters' Bank of Georgia is no more a suit against the state of Georgia, than against any other individual corporator. The state is not a party, that is, an entire party, in the cause."

And he added:

"The suit is against a corporation, and the judgment is to be satisfied by the property of the corporation, not by that of the individual corporators. The state does not, by becoming a corporator, identify itself with the corporation. The Planters' Bank of Georgia is not the state of Georgia, although the state holds an interest in it."

He further stated that—

"The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty."

When a like question came before the court in 1829 in Bank of Kentucky v. Wister, 2 Pet. 318, 323, 7 L. Ed. 437, the court declared that the question was "no longer open here."

In Bank of the United States v. Planters' Bank of Georgia, supra, it did not appear that the state owned all the stock of the Planters' Bank. But in the Bank of the State of Alabama v. Gibson's Adm'rs, 6 Ala. 814, and in Owen v. Branch Bank at Mobile, 3 Ala. 258, the state apparently was the exclusive proprietor of the bank. In the Bank of Alabama Case the court, quoting from the Supreme Court's opinion in the Planters' Bank of Georgia Case, declared that the reasoning in the latter case "applies with all force where the state is the sole corporator, as well as where it is associated with others. * * * It cannot be endured, that the Legislature, which is but the mere machinery of government, should be allowed to confer upon a moneyed corporation, established by itself, any portion of the sovereign power, which was inherent in the body politic."

In the Bank of State v. Gibbs, 3 McCord, 377, the Supreme Court of South Carolina had presented to it the question whether a simple contract debt due the bank was a debt due to the state within the meaning of a statute which entitled the state to a priority of payment. It was held that although the bank was owned entirely by the state it was not on that account entitled to claim any priority of payment. And in State Bank v. Clarke, 8 N. C. 36, the State Bank of that state was held a mere private corporation.

In Morawetz on Private Corporations (volume 1, § 3), that writer states:

"The fact that part, or even all, of the shares in a corporation are held by the state, does not necessarily render it a public corporation. Whether a corporation be public or private depends wholly upon its organization. Shares in a corporation may be held by a state in the same manner as by a private individual. * * * If a corporation is formed by the state with transferable shares, for the purpose of carrying on the banking business in the same manner as a private corporation, it must be classed as a private corporation in name as well as in fact."

Again he says in section 35:

"A state or municipality may become a shareholder in a private corporation; and the fact that a state is a shareholder, or even the sole shareholder, does not alter the legal status of the company as a private corporation."

An examination of the certificate of incorporation of the Fleet Corporation contains nothing which in any respect differentiates it from any other private business corporation. The object for which the corporation is created is a matter of private business. The object for which it is formed "is the purchase, construction, equipment, lease, charter, maintenance and operation of merchant vessels in the commerce of the United States," and in general to do every lawful act necessary and expedient to be done "for the profitable conducting of said business." And it was to exercise all the powers conferred by the laws of the district upon corporations organized under the same subchapter of the incorporation laws. Like any other business corporation, it has a capital stock divided into shares of $100 each. It has a board of trustees who are to manage its affairs. Its by-laws provided for meetings of the stockholders and that the trustees should be elected by the stockholders. Certificates of stock could only be transferred on the books of the company. The trustees were authorized to declare dividends from the surplus or net profits of the corporation.

[3] We see no adequate reason for holding that this corporation was other than a private business corporation. Indeed, that question is not now an open one in this court in view of the decisions in the Supreme Court of the United States to which we shall now refer.

In The Lake Monroe, 250 U. S. 246, 39 Sup. Ct. 460, 63 L. Ed. 962, the various acts of Congress relating to the United States Shipping Board and to the Fleet Corporation were reviewed. The Lake Monroe, while in process of construction, had been requisitioned and completed by the Fleet Corporation, and on its completion was delivered to the United States Shipping Board. It was thereafter assigned by that Board through the Fleet Corporation to a Boston firm which was employing the vessel for commercial purposes. The firm selected the master and officers and furnished the crew and was to account to the Fleet Corporation as agent of the Shipping Board for the moneys which the firm received. While the vessel was so operated, a collision occurred between her and a fishing schooner called Helena. A libel was accordingly filed against the Lake Monroe, and process was sought to be issued for the seizure of the steamship. It was thereupon objected that as the steamer was the property of the United States and in its possession and control, the court was without jurisdiction to enforce claims against her by process. The court did not accede to the contention of the government, but held that the vessel was subject to the ordinary liability of a merchant vessel, notwithstanding the indirect interest of the government in the outcome of her voyage, and that she could be subjected to judicial process in admiralty for the consequences of a collision.

In United States v. Strang, 254 U. S. 491, 41 Sup. Ct. 165, 65 L. Ed. 368, counsel for the United States argued that the Fleet Corporation is an agency of the United States formed only as an arm for executing purely governmental powers and duties vested by Congress in the President and by him delegated to it; that the acts of the Corporation, within its delegated authority, are the acts of the United

States; and that an inspector employed by the Fleet Corporation while performing his duties as inspector necessarily acted as agent of the United States. But the court held, affirming the court below, that a person employed as an inspector by the Fleet Corporation is not an agent of the government of the United States within the meaning of section 41 of the Criminal Code (Comp. St. § 10205), and that although all its stock is held by the Corporation it and the United States are separate entities.

The legal status of the Corporation was before the Supreme Court in 1922 in Sloan Shipyards Corporation v. United States Shipping Board Emergency Fleet Corporation, 258 U. S. 549, 42 Sup. Ct. 386, 66 L. Ed. 762. The opinion of the court was written by Mr. Justice Holmes, who said:

"The United States took all the stock but that did not affect the legal position of the company. United States v. Strang, 254 U. S. 491."

After referring to subsequent statutory enactments and executive orders conferring enormous powers upon the Fleet Corporation, Justice Holmes continued:

"These provisions sufficiently indicate the enormous powers ultimately given to the Fleet Corporation. They have suggested the argument that it was so far put in place of the sovereign as to share the immunity of the sovereign from suit otherwise than as the sovereign allows. But such a notion is a very dangerous departure from one of the first principles of our system of law. The sovereign properly so called is superior to suit for reasons that often have been explained. But the general rule is that any person within the jurisdiction always is amenable to the law. If he is sued for conduct harmful to the plaintiff his only shield is a constitutional rule of law that exonerates him. Supposing the powers of the Fleet Corporation to have been given to a single man we doubt if any one would contend that the acts of Congress and the delegations of authority from the President left him any less liable than other grantees of the power of eminent domain to be called upon to defend himself in court. An instrumentality of government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts. Osborn v. Bank of United States, 9 Wheat. 738, 842, 843; United States v. Lee, 106 U. S. 196, 213, 221. The opposite notion left some traces in the law, 1 Roll. Abr. 95, Action sur Case, T., but for the most part long has disappeared.

"If what we have said is correct it cannot matter that the agent is a corporation rather than a single man. The meaning of incorporation is that you have a person, and as a person one that presumably is subject to the general rules of law."

And the court concluded that the Fleet Corporation did not possess the sovereign's immunity from suit. The court held that a contract made by the Corporation "representing the United States of America" was the contract of the Corporation and was subject to be set aside if wrongfully brought about, and said:

"We attach no importance to the fact that the second contract, alleged to have been illegally extorted, was made with the Fleet Corporation 'representing the United States of America.' The Fleet Corporation was the contractor, even if the added words had any secondary effect."

In the Astoria Marine Iron Works Case, which was disposed of in the same opinion, the suit had been brought against the Fleet Corporation in a state court for breach of contract. The suit was re-

moved to the District Court and there dismissed upon demurrer on the ground that the only remedy was in the Court of Claims. The Supreme Court reversed and said that the Corporation was the immediate party to the contract and that the distinction between it and the United States was marked. See 258 U. S. page 569, 42 Sup. Ct. 386, 66 L. Ed. 762. It was further stated that the Fleet Corporation was suable in a state court for breach of a contract executed by it as a corporation "representing the United States of America."

Moreover, in the same opinion, the court affirmed the decision of this court in Re Eastern Shore Shipbuilding Corporation, 274 Fed. 893, in which this court held that a claim due to the Fleet Corporation, but which was put forward by it as an instrumentality of the government of the United States, was not entitled to a preference in bankruptcy, whatever might be the law as to a direct claim of the United States. This was upon the theory that the Fleet Corporation was a distinct entity and stood like other creditors in a court of bankruptcy. See 258 U. S. page 570, 42 Sup. Ct. 386, 66 L. Ed. 762.

In United States Shipping Board Emergency Fleet Corporation v. Sullivan, 261 U. S. 146, 43 Sup. Ct. 292, 67 L. Ed. 577, the court denied an application for a writ of certiorari and dismissed the writ of error. It appeared that Sullivan presented a claim for compensation to the Workmen's Compensation Bureau, Pennsylvania Department of Labor and Industry. He had claimed that at the time of his injury he was employed by the United States Shipping Board Emergency Fleet Corporation as a motor truck driver. The corporation answered and asserted that it was not liable for the reason that claimant is a direct employee of the United States Shipping Board Emergency Fleet Corporation and accordingly "is a civil employee of the United States of America, and will be compensated for injury under the federal Workmen's Compensation Act, subject to sustaining proof of disability." Sullivan obtained his award under the state law and the award was sustained by the courts of Pennsylvania. The case was carried by successive appeals to the highest court in Pennsylvania authorized to pass upon it (76 Pa. Super. Ct. 30), which declared:

"On its face we have here a claim for workmen's compensation presented against a corporation of the District of Columbia, doing business in this state, engaged in performing certain important matters committed to it by the Shipping Board relative to the purchase, construction, equipment, etc., of merchant vessels in the commerce of the United States, and answer made that it is not liable because the injured man was a civil employee of the United States. No evidence was presented to support this answer. * * * As the case was presented before the referee and the Board, we are satisfied that the award was fully justified, and it is accordingly confirmed and the appeal dismissed at the costs of the appellant."

In United States Grain Corporation v. Phillips, 261 U. S. 106, 43 Sup. Ct. 283, 67 L. Ed. 552, the plaintiff was the commanding officer of a ship of the United States Navy. The defendant was a Delaware corporation, the United States government being its principal stockholder. The suit was brought to recover $52,000, being one per centum of the value of gold carried from Constantinople to New York upon a destroyer of the United States Navy. The gold was the prop-

erty of the defendant corporation. But the corporation, the court said, "although in form a private corporation and liable to be sued as such, was organized and owned by the United States as an agency for public service, was not engaged in ordinary merchandising, but under Mr. Hoover's directions was performing public functions arising out of the war and its sequels." It was formed in pursuance of an executive order as an agency to enable the United States Food Administration to buy, store, and sell wheat, among other things. The stock, except the shares necessary to qualify seven directors, was all subscribed for and owned by the United States. Even the directors' shares were held by the United States indorsed in blank. It was admitted at the argument, and the court said that it would not be denied, that if the United States had been the legal owner of the gold the plaintiff would have been acting only in the course of his duty in carrying it. The court added:

"We are of opinion that the same thing is true here." "In substance the gold was the property of the United States. It is true that the legal title was in the Corporation, that the property of the Corporation might have been taken to pay a judgment against it, and that in other ways the difference of personality would be recognized."

The court thereupon reversed this court's decision in 279 Fed. 244. This decision is not to be regarded, however, as overruling the principle announced in the cases previously decided and to which we have made reference.

In United States v. Walter, 44 Sup. Ct. 10, 68 L. Ed. ——, decided on October 22, 1923, and not yet officially reported, the Supreme Court sustained the validity of an indictment which charged a conspiracy to defraud the United States by making and presenting for payment a fraudulent claim against the Fleet Corporation. A statute of the United States makes it a crime to conspire to obtain payment of a fraudulent claim against any corporation in which the United States of America is a stockholder. The court in this case, reversing the court below, said:

"As to the third count, while it is true that the corporation is not the United States, United States v. Strang, 254 U. S. 491, 41 Sup. Ct. 165, 65 L. Ed. 368, the contemplated fraud upon the corporation if successful would have resulted directly in a pecuniary loss to the United States, and even more immediately would have impaired the efficiency of its very important instrument. We are of opinion that it was within the words of section 37 'defraud the United States in any manner' and that on this as on the other point the decision below was wrong. Haas v. Henkel, 216 U. S. 479, 480, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112; United States v. Barnow, 239 U. S. 74, 79, 36 Sup. Ct. 19, 60 L. Ed. 155."

The case is entirely consistent with the cases heretofore decided by the court and lends no support to the position taken by the appellant.

The cases in the Supreme Court plainly show that the Fleet Corporation is an entity distinct from the United States, and that it is subject to the rules which are applicable to any private business corporation.

The like doctrine for the most part has been laid down in the other courts of the United States. It has been held in the following cases that the Fleet Corporation has the capacity to sue and be sued the same as other corporations: American Cotton Oil Co. v. U. S. Shipping Board Emergency Fleet Corporation (D. C.) 270 Fed. 296; Pope v. U. S. Shipping Board Emergency Fleet Corporation (D. C.) 269 Fed. 319; Ingram Day Lumber Co. v. U. S. Shipping Board Emergency Fleet Corporation (D. C.) 267 Fed. 283; Southern Bridge Company v. U. S. Shipping Board (D. C.) 266 Fed. 747; Banque-Russo Asiatique-London v. U. S. Shipping Board Emergency Fleet Corporation (D. C.) 266 Fed. 897; Lord & Burnham Co. v. U. S. Shipping Board (D. C.) 265 Fed. 955; Gould Coupler Co. v. Emergency Fleet Corporation (D. C.) 261 Fed. 716; Commonwealth Finance Corporation v. Landis (D. C.) 261 Fed. 440.

In Sales v. United States, 234 Fed. 842, 148 C. C. A. 440, a case which came before this court in 1916, we declared:

"When the United States enters into commercial business it abandons its sovereign capacity and is to be treated like any other corporation. Bank of United States v. Planters' Bank, 9 Wheat, 904, 6 L. Ed. 244. Although it absolutely owns the Panama Railroad Company and is the only person profiting or losing by its activities, still the railroad company sues and is sued just like any other corporation, in its own name."

In that case the United States owned the whole capital stock of the railroad company, absolutely dominated it, and was solely interested in its profits or losses.

In 1919, in Gould Coupler Co. v. United States Shipping Board Emergency Fleet Corporation, supra, Judge Hand, in the District Court for the Southern District of New York, stated that it appeared to him "too clear for dispute that the Fleet Corporation is in general capable of being sued." He declared that—

"When the President chose the Fleet Corporation as his agent to discharge the duties so imposed upon him ⁿ * * he chose it with all its limitations upon its head."

This was after the Supreme Court had decided The Lake Monroe Case, hereinafter referred to, and which Judge Hand cited, saying that it seemed to him to be controlling.

In Southern Bridge Co. v. United States Shipping Board Emergency Fleet Corporation, 266 Fed. 747, a case in the District Court for the Southern District of Alabama, the court had before it the question whether the state courts had any jurisdiction of a suit against the Fleet Corporation. The District Judge declared that the question resolved itself into whether the state had invested in the stock of a corporation doing a private business, or whether it had organized a corporation nominally a private one, but designed to perform the functions of the state, or to act as its agent or creature. He added that when the business undertaken by the corporation is that of the state, and not a mere private business, the fact that the government uses the medium of a private corporation in conducting the business, instead of conducting it in its own name, should make no difference,

and the government cannot be then sued by suing the corporation, any more than the government could be sued directly. He therefore held that the Fleet Corporation being an instrumentality of the government of the United States could not be sued in a state court. The conclusion reached in this case seems irreconcilable with the decisions of the Supreme Court of the United States and other of the federal courts and with those reached by the Supreme Court of Pennsylvania in Haines v. Lone Star Shipbuilding Co. (268 Pa. 92, 110 Atl. 788) decided a few weeks earlier but not at that time reported, and which is referred to elsewhere in this opinion.

In Federal Sugar Refining Co. v. United States Equalization Board, Inc. (D. C.) 268 Fed. 575, 584, Judge Mayer, then a District Judge, held that the defendant corporation, although incorporated under the laws of the state of Delaware by direction of the President in the exercise of a discretionary power and used as a government agency, is nevertheless subject to all the liabilities imposed by the laws of the state, including liability to suit, and that a suit against it is not one against the United States.

In Sloan Shipyards Corporation v. United States Shipping Board Emergency Fleet Corporation, 268 Fed. 624, it was held in 1920, by a District Court in the state of Washington, that the Fleet Corporation was merely an instrumentality created by the United States, acting in its sovereign capacity, for executing the purposes of the Shipping Board Act. And it was further held that a suit against it was a suit against the United States. After this decision was announced, the Supreme Court decided United States v. Strang, 254 U. S. 491, 41 Sup. Ct. 165, 65 L. Ed. 368, to which we have already referred. Thereupon the Sloan Case was assigned for reargument, and a very full reargument was had. The District Judge, however, wrote a second opinion in which he adhered to his former conclusion, and held the corporation to be immune from suit. Similar conclusions were reached in the district of Oregon. Astoria Marine Iron Works v. U. S. Shipping Board Emergency Fleet Corporation, 270 Fed. 635; Keeley v. Kerr et al. (D. C.) 270 Fed. 874.

In 1921, in Astoria Marine Iron Works v. U. S. Shipping Board Emergency Fleet Corporation, supra, the United States District Judge in Oregon held that the Fleet Corporation is in no sense a private corporation but is a purely government organization to meet war emergencies. He held that while so acting, it exercised the functions of the sovereign state. "True, private parties," he said, "may hold stock in the entity; but the control is lodged absolutely in the government, through its officers and agents. I am impelled to the conclusion that the Fleet Corporation is a governmental entity, created to exercise governmental functions within its restricted limitations, and that for its acts performed in that capacity the United States is not suable, except in the Court of Claims, involving an amount in excess of $10,-000." But this case, as we have seen, the Supreme Court reversed.

In Eichberg v. United States Shipping Board Emergency Fleet Corporation, 51 App. D. C. 44, 273 Fed. 886, the Court of Appeals of the

District of Columbia held that the Fleet Corporation is not such an agency of the government as to render it immune from suit. And it was declared to be an entity separate from the government, notwithstanding the delegation by the President of authority to exercise a portion of the power granted to him under the Act of June 15, 1917.

In John G. Wright & Co. v. United States Shipping Board Emergency Fleet Corporation, 285 Fed. 647, the District Court for the Southern District of New York held that the Fleet Corporation is a distinct corporate entity, and that a suit against it is not a suit against the United States which can be brought under the Tucker Act or in the Court of Claims.

In Traylor Engineering & Mfg. Co. v. U. S. Shipping Board Emergency Fleet Corporation, 277 Fed. 248, it was held in the District Court for the Eastern District of Pennsylvania, by Judge Thompson, that the Fleet Corporation is a separate entity notwithstanding all its stock is owned by the United States, and that where it enters into contracts it is suable in the same manner as other corporations.

In King County, Wash. v. United States Shipping Board Emergency Fleet Corporation, 282 Fed. 950, the Circuit Court of Appeals for the Ninth Circuit held that the shipyard property of the Fleet Corporation in effect belonged to the United States, and therefore was not subject to state taxation; it not appearing to the satisfaction of the court that Congress intended to permit property so held to be locally taxed. In the course of its opinion the court said:

"It is one thing for the government to constitute an agency for the convenient and expeditious transaction of its business, and to commit to such agency the control of certain public property, and to authorize it to contract and to sue and be sued in relation thereto, but quite another thing to permit such property to be incumbered with burdens in the imposition of which neither it nor its agent has any part. For reasons of expediency it might be willing to be bound by the consequence of the voluntary acts or omissions of such an agent, of its own selection, and might be willing in effect to waive its right to immunity from suit by consenting that such agent be sued as its representative in respect to property and matters within the scope of its agency, and even that the property held by such agent be subject to execution process; but all that would fall far short of permitting, or disclosing a willingness to permit, such property to be subjected to taxation levied by representatives of an independent government."

With this question of the power to tax this court is not now concerned. What we are concerned with is the legal status of the Corporation, and in the above decision the court expressly stated that it regarded its status as "of little, if any, significance." In the leading case of McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, what the court decided was that the state of Maryland could not tax the operations of the Bank of the United States, it being an instrument employed by the government to carry its powers into execution, but that the state was not deprived of its power to tax the real property of the bank within the state in common with other real property therein.

In United States Spruce Production Corporation v. Lincoln County, 285 Fed. 388, a like question to that in the King County Case, supra, was before the District Court in Oregon and was similarly de-

cided. It was held that the property, title to which was in the corporation, was held by it as a governmental agency and was used solely for governmental purposes, and therefore was not subject to state taxation. It was assumed that the United States Spruce Production Corporation stood to the general government of the United States in a like relation to that of the Fleet Corporation. But a suit against the Emergency Fleet Corporation, although it is a federal agency, is held not to be a suit against the United States in Manufacturers' Land & Improvement Co. v. U. S. Shipping Board Emergency Fleet Corporation (C. C. A.) 284 Fed. 231.

The Supreme Court of Pennsylvania had occasion, in 1920, in Haines v. Lone Star Shipbuilding Co., 268 Pa. 92, 110 Atl. 788, to determine the legal status of the Fleet Corporation. The question was very fully considered in an opinion written by Judge Kephart, which was concurred in by all the members of the court.

The Fleet Corporation made a contract with the Lone Star Shipbuilding Company to construct certain hulls to be used in the construction of ships. And the Lone Star Company became indebted to the plaintiff, and the latter sued out a writ of foreign attachment against funds in the hands of the Fleet Corporation. The garnishee being joined therein by the Attorney General of the United States sought to quash the writ. It was urged: (1) That the garnishee was an agency of the United States; (2) all the capital stock being held by or on behalf of the United States the company was in effect the government; (3) under the act of 1917 the company exercised the powers of the President; (4) in all its acts the company represented the United States, and its contract with the Lone Star Company was a contract by that company with the United States; (5) the Fleet Corporation had no assets of any kind except those provided by the United States. The court after a careful examination into the matter came to the conclusion that the Fleet Corporation "is a business corporation, to be treated as such, unless Congress expressly provides otherwise, which has not been done in the present instance." "If it was the intent of Congress," said the court, "that the Fleet Corporation should be immune from civil process, it would have been very easy to have written it into the act; but nowhere is such language found, nor can it be reasonably inferred therefrom. If the Fleet Corporation was to be immune from civil process of any nature whatever, why the necessity of a Fleet Corporation at all? The United States government, acting through the shipping board as such, was immune from such process. It possessed the power and authority to do all the corporation could do. What was the intent of the Congress when it authorized the creation of the Fleet Corporation if it was not for the purpose of conducting a business corporation and assuring to those with whom it dealt that they would have a speedy adjustment of all claims? If not so adjusted, they had a debtor responsible in a court of law for the contracts and obligations undertaken, and when its contractors incurred debts a way was at hand, as in this case, to compel payment. Where would this immunity cease, considering the language of the delegation

and the sundry subsequent delegation of the same subject-matter as the corporation was empowered to and did make?"

We see no escape from the conclusion which the Supreme Court of Pennsylvania reached in the case above referred to. The reasons given for it seem to us unanswerable.

We have thus reviewed, no doubt at too great length, the decisions of the courts as to the legal status of the Fleet Corporation. The conclusion which we have reached, upon principle and upon the authorities, is that that corporation is a private business corporation, constituting a distinct entity, and that it is not entitled to the immunities of the sovereign, but is liable to suit as any other private corporation upon its contracts even though it contracted as representing the United States.

It may here be pointed out that the Act of Congress of March 9, 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l), recognized the fact that the Fleet Corporation was a separate and distinct entity from the government of the United States, and that suits might be maintained against the corporation in its own name. That act (section 1 [section 1251¼]) provided as follows:

"That no vessel owned by the United States or by any corporation in which the United States or its representatives shall own the entire outstanding capital stock or in the possession of the United States or of such corporation or operated by or for the United States or such corporation, * * * shall hereafter, in view of the provision herein made for a libel in personam, be subject to arrest or seizure by judicial process in the United States or its possessions; provided, that this act shall not apply to the Panama Railroad Company."

Then in section 2 (section 1251¼a) it was provided:

"That in cases where if such vessel were privately owned or operated, * * * a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States or against such corporation, as the case may be, provided that such vessel is employed as a merchant vessel or is a tugboat operated by such corporation."

[4] It is, however, contended that the United States is the real party in interest under the mortgages dated June 14, 1918, July 30, 1919, and October 16, 1919, given by the Downey Corporation, defendant herein. We are unable to concur in that view, notwithstanding the fact that the United States in fact subscribed for the whole of the authorized capital stock. It is evident that the Shipping Act of 1916 contemplated a corporation in which private persons might be stockholders and which was to be formed like any business corporation. The fact that the United States took all the stock, as the Supreme Court said in United States v. Strang, supra, "did not affect the legal position of the company." By its incorporation it was made a private corporation with power to sue and be sued and was responsible before the law upon all of its contracts as well as for its wrongful acts. Under the law it was a private person and had all the attributes of a private corporation. Like any other corporation, it was the real party in interest in all its contracts.

It is true the Merchant Marine Act of 1920 (41 Stat. 988) by section 4 (Comp. St. Ann. Supp. 1923, § 8146¼aa) transferred to the Shipping Board all vessels and other property or interests of whatsoever kind which had been acquired by the President through any agencies whatsoever in pursuance of the authority granted him in any of the acts of Congress. But in section 2 (b) of the Marine Act (section 8146¼a) it is provided as follows:

"All rights, interests, or remedies accruing or to accrue as a result of any such contract or agreement or of any action taken in pursuance of any such act or parts of acts shall be in all respects as valid, and may be exercised and enforced in like manner, subject to the provisions of subdivision (c) of this section, as if this act had not been passed."

Subdivision (c) has no bearing upon the question now being discussed. It relates to the liquidation of matters incident to the exercise by or through the President of the powers conferred or duties imposed upon him by any of the acts or parts of acts repealed.

The Merchant Marine Act of 1920 expressly negatives the idea that section 4 of the act was intended to affect the right of the complainant to enforce its mortgages against the Fleet Corporation "in like manner * * * as if this act had not been passed."

The construction we give to the statute seems to us to accord with the legislative intent and not to conflict with the general principles of law. While, of course, not conclusive, it is interesting to observe that the construction we place upon the statute was that placed upon it by the Fleet Corporation itself as shown by its conduct in December, 1921. It at that time made public offer to sell as its own property the three mortgages in question and then stated them to be subject to the prior lien for $1,500,000 held by the plaintiff.

In the first of the three mortgages given by the Downey Corporation to the Fleet Corporation, and which was dated June 14, 1918, the Fleet Corporation is designated without more as the mortgagee. But this mortgage recites that it is made pursuant to an agreement dated June 3, 1918, "and is subject to all the provisions of said agreement." And that agreement stated that it was entered into by the Fleet Corporation the lender "representing the United States of America." And the mortgage, dated July 30, 1919, states upon its face that the mortgagee is the United States Shipping Board Emergency Fleet Corporation, "representing the United States of America." It also appears that the third mortgage, dated October 16, 1919, contains precisely the same statement as the second as to the mortgagee.

From all this the contention is that the United States is the real party in interest under these three mortgages, and that all the world had notice that the title to these mortgages was in the United States. It hardly seems necessary, upon this aspect of the case, to say anything more than to recall that the Supreme Court in Astoria Marine Iron Works v. United States Fleet Corporation reported under Sloan's Shipyard Corporation v. United States Shipping Board Emergency Fleet Corporation, supra, decided as recently as 1922, in construing a contract made with the Fleet Corporation "representing the United States of America" in a passage heretofore quoted in this opinion de-

clared that "the Fleet Corporation was the contractor, even if the added words had any secondary effect." On contracts made by the Fleet Corporation, acting merely as the agent of the government, no action could be maintained by or against it on any contract so made. In Sheets v. Selden's Lessee, 2 Wall. 177, 187 (17 L. Ed. 822), the Supreme Court, speaking through Mr. Justice Field in an opinion in which the court was unanimous, said:

"* * * And it may be stated generally that when a deed is executed, or a contract is made on behalf of a state by a public officer duly authorized and this fact appears upon the face of the instrument, it is the deed or contract of the state, nowithstanding that the officer may be described as one of the parties, and may have affixed his individual name and seal. In such cases the state alone is bound by the deed or contract, and can alone claim its benefits."

And in Parks v. Ross, 11 How. 362, 374 (13 L. Ed. 730), the court, speaking of contracts entered into by an agent of the government, unanimously declared that—

"As regards him the rule is, that he is not responsible on any contract he may make in that capacity; and wherever his contract or engagement is connected with a subject fairly within the scope of his authority, it shall be intended to have been made officially, and in his public character, unless the contrary appears by satisfactory evidence of an absolute and unqualified engagement to be personally liable."

See Hodgson v. Dexter, 1 Cranch, 345, 2 L. Ed. 130; Garland v. Davis, 4 How. 148, 11 L. Ed. 907; Jones v. Le Tombe, 3 Dall. 384, 1 L. Ed. 647; Brown v. Bradlee, 156 Mass. 28, 30 N. E. 85, 15 L. R. A. 509, 32 Am. St. Rep. 430; Gill v. Brown, 12 Johns. (N. Y.) 385; Ross v. Brown, 74 Me. 352; Wing v. Glick, 56 Iowa, 473, 9 N. W. 384, 41 Am. Rep. 118; District of Columbia v. Camden Iron Works, 181 U. S. 453, 460, 21 Sup. Ct. 680, 45 L. Ed. 948; Belknap v. Schild, 161 U. S. 10, 17, 16 Sup. Ct. 443, 40 L. Ed. 599.

What has been said makes it plain that the Fleet Corporation must be regarded as the real party to the contract and is the real party in interest. If the Fleet Corporation was not the contractor and simply made the contract on behalf of the United States, as its agent, then in accordance with the doctrine announced in Sheets v. Selden's Lessee and in Parks v. Ross the Fleet Corporation would not be responsible on the contracts it made "as representing the United States." But as we have seen from the Astoria Marine Iron Works' Case, supra, the Supreme Court holds that the Fleet Corporation is liable on its contracts even though in making them it uses the words "representing the United States of America." We see no escape from the conclusion that the United States is not the real party in interest under the three mortgages given by the Downey Corporation to the Fleet Corporation.

And we think it too clear for discussion that if the United States was not the real party in interest under those mortgages it was not an indispensable party to the foreclosure suit. In such suits the only necessary parties are those who must be before the court before any valid and effectual decree can be made. As the Fleet Corporation was the real party in interest, it was not necessary to make the stockhold-

ers therein, or in this case the stockholder therein, a party to the suit.

The Fleet Corporation sets up the defense that the liens of the 1918 and 1919 mortgages were superior to those asserted by the plaintiff. And the plaintiff in reply claims that the Fleet Corporation is estopped by the letter of January 21, 1920, from asserting the priority of its mortgages. It is said that this letter of January 21, 1920, was without consideration and that there was nothing in the relation of the parties at the time the letter was written and sent which would cause the Fleet Corporation to benefit from the subordination of its mortgages. The last ship built under Contract 30 had been built and delivered in 1919 and prior to the writing of the letter. The promise, it is urged, was purely gratuitous and as such beyond the powers of performance of the officers who made it; it could not be validated by any corporate action, however formal, and the corporate seal on the letter could not supply consideration where, obviously, none existed. Messrs. Blodgett & Co. knew, or were chargeable with knowledge of, all of these facts.

We come therefore to inquire, in conclusion, whether in the present situation the Fleet Corporation can interpose the defense that the action taken by it was ultra vires. No claim is put forward that the transaction was ultra vires per se on the ground that it was not connected with the business which the corporation was authorized to transact. The charter of the corporation defines its powers in a provision hereinbefore quoted.

[5] The contracts of a corporation are presumed to be intra vires until the contrary is made to appear. The maxim, "Omnia acta rite esse præsumuntur," is applicable. Thomas v. West Jersey R. Co., 101 U. S. 71, 25 L. Ed. 950; Express Co. v. Railroad Co., 99 U. S. 191, 199. 25 L. Edd. 319; Ohio, etc., Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693; Jacobs v. Monaton Realty, etc., Co., 212 N. Y. 48, 105 N. E. 968; Chautauque County Bank v. Risley, 19 N. Y. 369, 381, 75 Am. Dec. 347; Knapp v. Tidewater Coal Co., 85 Conn. 147, 81 Atl. 1063. But we do not find it necessary to consider whether what was done was ultra vires. The question narrows itself down to this, whether if it were ultra vires the Fleet Corporation could set it up as a defense.

[6] The doctrine is established that the United States is neither bound nor estopped by acts of its officers or agents in entering into an agreement to do or cause to be done what the law does not sanction or permit. Utah Power & Light Co. v. United States, 243 U. S. 389, 409, 37 Sup. Ct. 387, 61 L. Ed. 791. See, also, Yuma Water Association v. Schlecht, 262 U. S. 138, 144, 43 Sup. Ct. 498, 67 L. Ed. 909. In Pine River Logging Co. v. United States, 186 U. S. 279, 291, 22 Sup. Ct. 920, 46 L. Ed. 1164, the court said: "No authority had been given them," the government's agents, "to extend the contracts." "No discretion had been given them to waive or alter the contracts in any particular. No conduct of theirs can estop the government from asserting its rights."

The mortgages for which priority is claimed by the defendant are mortgages given by the Downey Corporation not to the United States but to the Fleet Corporation—a separate and distinct entity. The

officers of the Fleet Corporation may estop that corporation by their official conduct when the officers of the sovereign by their conduct might not estop the government of the United States.

[7, 8] The plaintiff acquired its title as trustee for the bondholders upon the faith of a recorded title, and the bonds were issued and sold to the public as first mortgage bonds in reliance upon the subordination of the defendant's mortgages. There was no duty upon the trustee or the bondholders to go back of the record title which disclosed a subordination entirely regular on its face and importing consideration. The defendant had the power to subordinate its mortgages for a consideration, and with the knowledge and intention that the subordination would be relied upon by innocent purchasers of the bonds it gave the subordination all the appearance of regularity and validity and thereby induced the bondholders to purchase their bonds. Under the circumstances, we think the defendant is estopped from invoking the defense of ultra vires, since it was itself a party to the creation of the appearance of subordination in reliance upon which the bondholders in good faith parted with value. The bondholders are not in the position of persons dealing directly with a corporation who receive something for nothing, and who, if deprived of what they received, cannot complain that they are treated inequitably. The law is well settled that where a contract has been executed by both parties, as in this case, the corporation cannot successfully plead ultra vires to avoid the contract provided it is not tainted by fraud, or prohibited by statute, or condemned by sound public policy. Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 467, 6 Sup. Ct. 809, 29 L. Ed. 963; National Bank of Xeniz v. Stewart, 107 U. S. 676, 2 Sup. Ct. 778, 27 L. Ed. 592; Kanneberg v. Evangelical Creed Congregation, 146 Wis. 610, 131 N. W. 353, 39 L. R. A. (N. S.) 138, Ann. Cas. 1913C, 376; Londner v. Perlman, 129 App. Div. 93, 113 N. Y. Supp. 420, affirmed in 198 N. Y. 629, 92 N. E. 1090; McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341. The Fleet Corporation upon the well-recognized principles of equity having agreed to subordinate its mortgages to the mortgage of 1921 cannot now be heard to repudiate its agreement. The prior mortgages became in fact and in law subordinate to the supplemental mortgage of 1920 at the moment that the latter mortgage was executed in reliance upon the agreement that those mortgages should be so subordinated.

The conclusion we have reached is that the District Court had jurisdiction of the foreclosure suit and that no error was committed.

Decree affirmed.