### KERR et al. v. ENOCH PRATT FREE LIBRARY OF BALTIMORE CITY et al.

### No. 2071.

District Court, D. Maryland.

March 7, 1944.

516

Chas. H. Houston, of Washington, D. C., and Wm. A. C. Hughes, Jr., of Baltimore, Md., for plaintiffs.

Allan A. Davis, Asst. City Sol., of Baltimore, Md., for Mayor and City Council.

Harry N. Baetjer and Venable, Baetjer & Howard, all of Baltimore, Md., for all other defendants.

CHESNUT, District Judge.

The Enoch Pratt Free Library is a very well known institution in Baltimore City. Its main branch, centrally located in the heart of the City, is housed in a large specially designed building with all moden library equipment, and it operates twenty-six branch libraries located in other sections of the City. It is generally regarded as one of the outstanding free libraries in the United States. It is a Maryland corporation created by Chapter 181 of the Maryland Acts of Assembly of 1882. By that Act its management was vested in a Board of nine (9) Trustees named in the Act, with power to elect their successors, "the control and management of the said Library and other property to be in said Board of Trustees". It is a non-stock corporation. The purpose of the corporation as indicated in the Act was for the object "of perpetually promoting and diffusing knowledge and education among the people of the City of Baltimore". At the present time the Library has about 800,000 books, and in its main library and branches employs about eighty professionally trained assistant librarians. The entire library system lends approximately three million books a year to 300,000 Baltimoreans.

As a purely intra-mural activity, the management of the Library periodically gives a training course for the technical instruction of prospective employes as Assistant Librarians, to fill vacancies in its technical staff as they occur from time to time. On April 23, 1943, the plaintiff in this case, Louise Kerr, a well educated young colored woman resident in Baltimore City, applied to the Library for admission to its current training class, for the purpose of obtaining an appointment and employment as an Assistant Librarian. The management of the Library declined to accept her as a member of the training class for the assigned reason that at that time there was no vacancy in the technical staff of the library which, in the opinion of the Board of Trustees, could properly be filled by a colored woman. In this respect the policy of the Board of Trustees had been stated in a resolution of September 17, 1942 reading as follows:

"Resolved that it is unnecessary and unpracticable to admit colored persons to the Training Class of The Enoch Pratt Free Library. The Trustees being advised that there are colored persons now available with adequate training for library employment have given the Librarian authority to employ such personnel where vacancies occur in a branch or branches with an established record of preponderant colored use."

Thereafter on October 5, 1943 the plaintiff filed the instant suit against the Library Corporation, its several Trustees individually, its present Librarian and the Mayor & City Council of Baltimore, in which she alleged that she had been refused admission to the Training Course "solely because of her race or color"; and that the action of the corporation in this respect violated the equal protection clause of Section 1 of the 14th Amendment to the Constitution of the United States, and Section 41, Title 8 United States Code Annotated, and that the defendants thereby became severally liable to the plaintiff under 8 U.S.C.A. § 43. In consequence the plaintiff in count 1 of the complaint sues for pecuniary damages of $5,000 against each individual defendant, and in count 2 for injunctive relief against continued refusal to receive the plaintiff as a member of said Training Course; and in count 3 for declaratory judgment to establish her right to have her application for the Training Course considered by the management of the Library, "without discrimination because of her race or color". The defend-

ants, other than the Mayor and City Council of Baltimore, resist the plaintiff's demands on the factual ground that the plaintiff was not refused admission to said Training Course solely because of her race or color; and all the defendants, including the Mayor and City Council of Baltimore, further defend on the legal ground that in the management of the said Library and the filling of appointments to the Library Staff, the Trustees are acting as a *private* and not a *public governmental* agency, and therefore are not within the scope of the 14th Amendment and the federal statutes on which the plaintiff relies. The case has been fully presented on the pleadings, evidence and arguments of counsel for the respective parties.

Dealing first with the factual defense, it is important to learn from the evidence just what is the Training Course referred to and why the plaintiff was not received into it. The Course has been conducted at periodic intervals for about 15 years. The requirements for admission to the class are described in the circular of information filed in evidence as Defendants' Exhibit No. 1. Among them are the following:

"In general, the educational qualifications necessary for teaching and for library work are the same. The preferred preparation for admission to the Training Class is a college degree representing a scholastic average of 80% for the entire course. * * * Initiative, personality, enthusiasm, sympathy and serious purpose are requisite qualities. * * * All applicants are required to take a competitive entrance examination. * * * The large number of applicants makes it necessary to limit the number who take each examination to the 15 or 20 who, in the opinion of the Librarians, the Director, and several Department Heads, seem most likely to function well in library work. Members of the Training Class will be chosen from those applicants who have qualified by scoring the highest in the tests and whose previous education, training, experience and personality seem best to fit them for the work. * * * As the practical work is equivalent to part-time employment in the Library, members of the class will be paid at the rate of $40.00 a month, effective January 1, after the first three months of training have been successfully accomplished. * * * Although the primary purpose of the Training Class is to prepare individuals for positions on the staff of the Enoch Pratt Free Library, the Library does not guarantee to appoint graduates of the Training Class. It is probable, however, that those who stand high in the work will receive such appointments. In return for the training given, an applicant is expected to work on the staff for one year after graduation, providing a position is offered."

It thus clearly appears that the Training Course is only a feature of the internal management of the Library, and is not conducted either as a general library instruction course or for purposes of general education. The evidence in the case shows that the plaintiff has the requisite educational requirements for the class but, as her application was not accepted or considered by the Management, it does not affirmatively appear whether she would otherwise have qualified for admission into the Class through competitive examination, physical condition and personality. However, these latter considerations seem unimportant in the case in view of the fact that her application was not further considered by the Management on the ground that if she had successfully competed there would have been no position to which she could or would have been appointed by the Board. In short, the position of the Board in declining to consider her application was placed on the ground that the Training Course was a purely intra-mural activity for the purpose of giving technical instruction to prospective employes and as there was no vacancy to which the plaintiff could have been appointed, it would have been unfair to her to let her take the Training Course and an unnecessary expense to the Library in giving such training.

I find from the evidence, which in this respect is practically uncontradicted, that the reason given by the management of the Library for its refusal to consider her application was genuine and in good faith, and not solely by reason of her race or color. This finding of fact would seem to be conclusive in favor of the defendants on consideration of the complaint as literally framed. But counsel for the plaintiff contends that there is implicit in the complaint a broader view of the case which, despite the particular finding, justifies the conclusion that the failure of the management to consider the plaintiff's application was really based solely on reasons of race or color. Thus it is argued that the Training Course is only a means to an end, that

is, appointment to a position as Assistant Librarian; that vacancies in the whole Staff of 80 professional assistants are continually occurring and are filled from the successful graduates of the Course; and that therefore there would have been vacancies occurring which might well have been filled by the appointment of the plaintiff to such a position, were it not for the hitherto established policy of the Board of Trustees to appoint to positions as Assistant Librarians only white persons. In this connection, counsel for the plaintiff advanced the proposition that the Board of Trustees of the Enoch Pratt Free Library constitute a *public agency* administering a public governmental function and therefore all applicants for positions of employment in the Library System must be fairly considered by the Trustees on their individual merits irrespective of race or color; and that the policy of the Board in generally employing only white persons in the capacity of technical Assistant Librarians is contrary to the requirements of the 14th Amendment and the federal statutes referred to.

The evidence shows that from 1882 to 1942 only white persons have been employed by the management of the Library as Assistant Librarians, although there were numerous colored employes serving in minor clerical or more ministerial activities. However in 1942 the Board departed from its prior practice by engaging two technical Assistant Librarians for service at one of the branches of the Library System where the patronage of the Library was predominantly by Negroes; and the testimony shows that this departure from prior practice was experimental and tentative on the part of the Trustees for the purpose of determining whether in their judgment it was desirable in the interest of the best public service, and whether, as tested by experience, it could be wisely further extended in practice. The positions just referred to were filled after competitive examination taken by Negro applicants who, to the knowledge and information of the Board, had become sufficiently qualified for the work without having received the instruction in the particular Training Course conducted by the Library.

For the purposes of this case it may be assumed that appointments to positions made by a *governmental agency* must be without discrimination solely on the ground of race or color;[1] but to bring the plaintiff's case within the scope of the 14th Amendment, it is clearly established as a matter of law that the exclusion of a Negro from appointment to a position or office must have resulted from what constitutes *State* action, and not only an action of a private agency or individual. The precise applicable language of the 14th Amendment, § 1, is—"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." And sections 41 and 43 of 8 U.S.C.A. defining and protecting civil rights, are not broader in this respect than the particular Constitutional provision. These sections read as follows:

"§ 41. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be par-

---

[1] See Alston v. School Board of Norfolk, 4 Cir., 112 F.2d 992, 130 A.L.R. 1506; Mills v. Lowndes, D.C.Md., 26 F. Supp. 792–801; Mills v. Board of Education of Anne Arundel County, D.C.Md., 30 F.Supp. 245. In People v. Crane, 214 N.Y. 154, 108 N.E. 427, 431 (a case applying a State statute excluding aliens from employment on certain public work) Mr. Justice Cardozo, then a member of the Court of Appeals of New York, said:

"In thus holding that the power exists to exclude aliens from employment on the public works, we do not, however, commit ourselves to the view that the power exists to make arbitrary distinctions between citizens. We do not hold that the government may create a privileged caste among the members of the state. * * * We do not hold that it may discriminate among its citizens on the ground of faith or color. * * * A citizen may not be disqualified because of faith or color from service as a juror. * * * For like reasons we assume that he may not be disqualified because of faith or color from serving the state in public office or employment. It is true that the individual, though a citizen, has no legal right in any particular instance to be selected as contractor by the government. It does not follow, however, that he may be declared *disqualified* from service, unless the proscription bears some relation to the advancement of public welfare. * * * The Legislature has unquestionably the widest latitude of judgment in determining whether such a relation exists, but we are not required to hold that there is no remedy against sheer oppression. Where the line must be drawn we do not now determine."

ties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind and to no other."

"§ 43. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The scope of prohibition by these constitutional and statutory enactments is therefore limited to what in any particular case constitutes State action, and does not include action by private individuals or corporations. United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588; Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664; Ex parte Virginia, 100 U.S. 339, ·346, 25 L.Ed. 676; James v. Bowman, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979; Commonwealth of Virginia v. Rives, 100 U.S. 313, 318, 25 L. Ed. 667.

■■ What constitutes State action is a problem for judicial determination in each case and is not always easy to determine. This was succinctly stated by Mr. Justice Frankfurter in his concurring opinion in Snowden v. Hughes, 64 S.Ct. 397, 405, the latest case which I have noted dealing with the civil rights statutes:

"But to constitute such unjust discrimination the action must be that of the state. Since the state, for present purposes, can only act through functionaries, the question naturally arises what functionaries, acting under what circumstances, are to be deemed the state for purposes of bringing suit in the federal courts on the basis of illegal state action. The problem is beset with inherent difficulties and not unnaturally has had a fluctuating history in the decisions of the Court. Compare Barney v. City of New York, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737, with Raymond v. Chicago Union Traction Co., 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757, City of Memphis v. Cumberland Tel. Co., 218 U.S. 624, 31 S.Ct. 115, 54 L.Ed. 1185, with Home Tel. & Tel. Co. v. Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510. It is not to be resolved by abstract considerations such as the fact that every official who purports to wield power conferred by a state is *pro tanto* the state. Otherwise every illegal discrimination by a policeman on the beat would be state action for purpose of suit in a federal court."

The problem involved constitutes a federal question on which decisions of the particular state are not in themselves conclusive. In Nixon v. Condon, 286 U.S. 73, 88, 52 S.Ct. 484, 487, 76 L.Ed. 984, 88 A.L.R. 458, Mr. Justice Cardozo, for the court, said:

"Whether in given circumstances parties or their committees are agencies of government within the fourteenth or fifteenth Amendment is a question which this court will determine for itself. It is not concluded upon such an inquiry by decisions rendered elsewhere. The test is not whether the members of the executive committee are the representatives of the state in the strict sense in which an agent is the representative of his principal. The test is whether they are to be classified as representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action."

In the instant case counsel for the respective parties are, I think, correctly in agreement that the test here is whether the Board of Trustees of the Library are acting in a public capacity as representatives of the State or merely as a private corporation, in the management of the Library. The question thus presented must be determined upon consideration of the public acts of the State of Maryland and the authorized municipal ordinances of Baltimore City, in the light of the evidence bearing upon the subject of the relations between the Library Corporation and Baltimore City. These are unique in the history of the origin and subsequent development of the Enoch Pratt Free Library. No parallel case has been cited by counsel and none is known to the court. And therefore there is evidently no judicial decision to serve as a precedent for the determination of the problem in the instant case. Therefore it is necessary to review the history of the Library in some detail.

In 1882 Enoch Pratt, a wealthy and public spirited citizen of Baltimore, proposed to establish "a free circulating library for

the benefit of our whole City", and to that end on January 21st, he wrote a letter to the Mayor and City Council of Baltimore in which he proposed to erect a library building on West Mulberry Street in Baltimore City, at a cost of about $250,000, and to convey the property by deed to the City, and also to pay to the City the sum of $833,333.00,—

"provided the City will grant and create an annuity of Fifty Thousand Dollars ($50,000) per annum forever, payable quarterly to the Board of Trustees for the support and maintenance of the Library and its branches. I propose that a Board of nine (9) Trustees be incorporated for the management of 'The Pratt Free Library of the City of Baltimore', the Board to be selected by myself from our best citizens, and all vacancies which shall occur, shall be filled by the Board. The articles of incorporation will contain a provision that no trustee or officer shall be appointed or removed on religious or political grounds. The Trustees are to receive from the City the quarterly payments, and to expend it at their discretion for the purposes of the Library. * * * The Trustees will be required to make an annual report to the Mayor and City Council of their proceedings, and of the condition of the Library, and the report will contain a full account of the money received and expended."

This munificent gift was duly accepted by the Mayor and City Council of Baltimore and all necessary and appropriate legislation by the Assembly of Maryland and by Ordinances of Baltimore City duly enacted. The Library was formally opened to the public on January 4, 1886. The title of the Maryland Act of 1882, § 181, was "An Act to enable the Mayor and City Council of Baltimore to accept a donation from Enoch Pratt for the establishment and perpetual endowment of a Free Public Library in said City, to be known as 'The Enoch Pratt Free Library of Baltimore City', and to provide for the appointment and incorporation of Trustees for the management thereof." By this Act, after proper preamble, Baltimore City was empowered to accept Mr. Pratt's proposal on the conditions mentioned. A Board of nine trustees, including Enoch Pratt, George William Brown (then Chief Judge of the Supreme Bench of Baltimore City), Charles J. Bonaparte, James A. Gary, and others, were constituted and appointed the Board of Trustees of the Enoch Pratt Free Library of Baltimore City, and they and their successors—

"are hereby appointed a body politic and corporate by the name of 'The Enoch Pratt Free Library of Baltimore City', with power and are required to fill any vacancies in said Board occurring by resignation, disability or otherwise and to perpetuate their succession and do all necessary things for the control and management of said Library and its branches, and to perform the duties imposed on them by this Act, and to receive from the Mayor and City Council of Baltimore the said sum of $50,000 per annum as aforesaid, and expend the same for the purpose of said Library in such manner as they shall think proper, and to make all necessary by-laws and regulations for the government and administration of said trust, *and for the appointment of the necessary officers and agents.*" (Italics supplied)

It was further provided that Baltimore City should appoint a Visitor "who shall as often as once a year examine the books and accounts of said Trustees and make a report thereof to the Mayor and City Council of Baltimore; and said Mayor and City Council shall, in case of any abuse of powers of said Trustees or their successors, have the right to resort to the proper courts to enforce the performance of the trusts hereby imposed on them." Another provision of the Act was that the Ordinance to be passed by Baltimore City must be approved by a majority of the votes of the legal voters of Baltimore City. The appropriate Ordinance was duly enacted on July 15, 1882, being Ordinance No. 106 of that year. And it was duly ratified and approved by the voters of the City.

By deed dated July 2, 1883, Enoch Pratt and wife conveyed the physical property of the completed library building to the Mayor and City Council of Baltimore and in said deed in consideration of Mr. Pratt's whole gift of property and money, Baltimore City covenanted and agreed with the Library Corporation to pay to it the annual annuity of $50,000 in equal quarterly instalments; and the Library Corporation also covenanted "to appropriate any and all annual sums by it to be received entirely and solely for its corporate purposes, and to make annual reports to the City of the condition of the Library with full account of the moneys received and expended by the Trustees." The deed further provided

that by joint action the City and the Library could sell and convey the real estate conveyed "for the purposes of the trust" the proceeds to be invested in other property for the same purposes.

The subsequent history of the Library and the development of its further relations with Baltimore City are also interesting. In 1907 the well known Andrew Carnegie offered to give to the Mayor and City Council of Baltimore $500,000 for the erection of 20 branch buildings for the use of the Enoch Pratt Free Library of Baltimore City on the sole condition that the City should provide for the maintenance of the branches in the annual amount of not less than 10% of the cost of the buildings themselves, and that sites for the said buildings should be furnished or provided by the City. This offer of Mr. Carnegie was accepted by the City by Ordinance No. 275 of 1907, approved May 11, 1907. In the Ordinance the City undertook and agreed that the sum of $500,000 "shall be received and expended by the Trustees of the Enoch Pratt Free Library in the erection of twenty branch buildings upon sites furnished or provided by the said Mayor and City Council and accepted by the said Trustees", and that the said branches should be maintained by the City by a yearly provision in the tax levy for a sum of not less than 10% of the amount given by Mr. Carnegie, the annual appropriation to be expended by the Trustees "for the maintenance as aforesaid in such manner as may be specified from year to year in the Ordinance of Estimates". The Ordinance was impliedly approved by the State Legislature, c. 144 of the Acts of 1908, p. 586, authorizing the City to make appropriations from the levy for the support of the Library. The money was advanced by Mr. Carnegie and twelve library branches constructed therefrom, and Baltimore City has annually made due appropriations for their maintenance, all as provided in the authority given therefor.

By 1927 the Library had so expanded its services to the people of Baltimore that it had outgrown the original building on West Mulberry Street, and some additions thereto, and demonstrated the possibility of its wider utility if it could be furnished with a new, larger, and more modern library building. By the Maryland Act of 1927, c. 328, the Legislature authorized the City to incur, when approved by the vote of the citizens of Baltimore, a debt of $3,000,000 for the acquisition of additional real estate and the erection thereon of a modern library building to be used by the Library Trustees. By Ordinance No. 1053 of April 1927, the City appropriately authorized the incurring of this debt upon approval by the people, which was duly given. Thereafter the City acquired by condemnation or purchase the necessary land, and erected thereon a modern library building which now constitutes the central branch of the Library. By Ordinance approved December 16, 1930, No. 1195, the City authorized the incorporation in the new library site of the parcels of land previously occupied by the central branch, the razing of the old buildings, and the erection on the site of a suitable building for a free public library and the installation in said building when completed of the Enoch Pratt Free Library. Section 3 of the Ordinance provided that upon the completion of the buildings "The Enoch Pratt Free Library of Baltimore City shall be installed therein for the purpose of maintaining, conducting and operating a Free Public Library, for the purpose of perpetually promoting and diffusing knowledge and education among the people of the City of Baltimore". The building so authorized has been completed and has now been in use for some years past.

The Library under the management of its Board of Trustees has so demonstrated its usefulness that, in addition to the monetary obligations assumed by the City by virtue of the original Pratt and Carnegie gifts, the City has also for many years past voluntarily appropriated from its general funds raised by taxation, large additional sums of money for expenditure by the Library. At the present time the amount of the voluntary appropriations by the City exceeds $500,000 a year. Until about 12 years ago the moneys were paid over by monthly check from the City to the Library Corporation and directly expended by it. Since that time, however, by agreement between the City and the Library, the accounts are kept and payments made directly by the City upon orders and vouchers approved by the Library Corporation. This arrangement was made to take advantage of the City's comprehensive auditing and disbursement system of accounting. The City auditor has been the Visitor provided for in the original enactments. The amounts of the voluntary appropriations by the City for the benefit of the Library

are determined each year by the Board of Estimates of the City on consideration and approval or change in the budget submitted by the Library. All appointments to the Library Staff, whether technical, clerical or otherwise, are made only by the Library; but in submitting its budget it generally conforms to a scale of salaries for clerical and ministerial positions customary with the City Classified Service. The employes of the Library are, however, not within the jurisdiction of the City Service Commission and are not appointed as a result of Civil Service examinations. However, they are, under a special Act of Assembly (Acts of 1939, c. 16, and Ordinance No. 961 of 1939), included within the City's general pension and retirement system for municipal employes. The management of the Library buys its own supplies and creates no obligation on the City in the management of the Library. All disbursements made by the City in payment of bills incurred by the Library are paid only upon vouchers approved by the Library managers.

The resultant relations of the Library and the City are therefore these. (1) The management and operation of the Library is wholly committed to the Board of Trustees; (2) the title to all the property of the Library, including its equipment of books and furniture, is vested in the City for the use of the Library; (3) the City is legally obligated to pay $100,000 a year to the Library in accordance with the Pratt and Carnegie gifts, but is not legally obliged to make any further appropriations for the Library; (4) nevertheless the City has for years past made additional voluntary appropriations to a very large amount, and (5) the City has no legal authority to supervise or in any way control the management of the Library by the Trustees with respect to appointments to staff positions or in the amount of annual expenditures, except by reducing partially or entirely the amount of its voluntary appropriations for the benefit of the Library.

On the basis of these relations between the City and the Library, it is argued by counsel for the plaintiff that the dominant factor is the City's economic control of the situation; and it is pointed out that the Library could not possibly function on anything like its present scale of operations except for the large voluntary appropriations made by the City. It is also stressed that the title to all the property of the Library, real and personal, is vested in the City. And from these considerations it is argued that the dominant aspect of the Library, in the receipt and expenditure of public moneys, should be regarded as the exercise of a public governmental function far beyond that of a mere private agency. And reference is pointedly made to the language of Mr. Justice Cardozo in the Nixon case, supra, to the effect that it is only necessary for the plaintiff to show that in all the circumstances the functions performed by the Library management are of such a nature that they come within the constitutional limitation. However, this argument rather assumes than demonstrates the proposition that the management of the Library constitutes the exercise of public authority, or in other words, is state action. The question here to be decided is not whether in the broad aspect of the relations between the City and the Library the latter is performing a public service by expenditure of public money, but is the more limited question whether in the management of the Library the Trustees are acting in a private capacity or are representatives of the State to such an extent that their action amounts to state action, and particularly with respect to appointments to technical staff positions in the Library System. Or more concretely stated, is the nature of the function of the Library management such that the Trustees have the lawful right to fill staff positions by appointing white persons only to these positions.

The evidence shows clearly enough that with very minor exceptions in number in the last year or two, the policy of the Board of Trustees has been not to appoint Negroes to these staff positions, and the reason for this policy has been the determination of the Trustees that better service can be given to the people of Baltimore by selecting them only from white persons, for one reason, because the great majority of those who use the main library and most of its branches are white persons, and the great majority of the technical staff are also white. "Separation of the races is normal treatment in this State," but with equivalent facilities in the benefits of public services. Williams v. Zimmerman, 172 Md. 563, 567, 192 A. 353; Durkee v. Murphy, 181 Md. 259, 29 A.2d 253, 256; University of Maryland v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R.

706. That the Trustees have exercised their judgment in this matter in the past in good faith and not with any personal hostility to or prejudice against the Negro race is fully supported by the evidence. And it also appears that they have an open mind for the future as to the desirability of appointments of additional young colored women of suitable qualifications to technical staff positions where it is found in the interest of good public service, considering particularly the predominant character of the patronage of the particular branch library. But apart from this, the court has no authority to interfere with the policy of the Board in selecting its agents, if in the exercise of its function in this respect, the Board is acting as a private corporation, and is therefore not within the scope of the federal enactments.

 Both the evidence in this case and the Maryland decisions require the holding that in managing the Library the Trustees are acting as a private corporation and not as representatives of the government, state or city. In the first place, Mr. Pratt's plan as conceived and consummated is inconsistent with the idea that the Trustees were to function in a governmental capacity. It is highly significant that he expressly reserved the right to personally appoint the original trustees, as a self perpetuating body. In a very real sense therefore the Trustees were representatives of Mr. Pratt, and not of the government, either city or state. The customary and conventional plan which Mr. Pratt might have followed would have been to create a private corporation and make the gift of property and money directly to it. That was the plan in the formation some ten years earlier of the Johns Hopkins University and the Johns Hopkins Hospital, with which Mr. Pratt doubtless was thoroughly familiar. Under such a plan the Trustees or Directors of the corporation must manage not only the general activities of the corporation but also its finances. Directors or Trustees may be much more competent for one activity than the other. Where the Board must manage the finances of the corporation the amount of its income for annual maintenance may fluctuate with economic factors and varying financial judgment. Evidently Mr. Pratt wished to avoid this possibility by providing with as much certainty as possible that the corporation should have a definite fixed annual income for maintenance. He therefore conveyed the property and money to the City with its covenant to annually pay $50,000 to the corporation for maintenance; but at the same time he was careful to provide that the expenditure of the annual maintenance fund should be committed, not to representatives of the City, but to a personally selected Board of Trustees. In effect he created two separate trusts, one in the property, of which the City was Trustee, for the payment of a fixed annual income to the corporation and enforceable by the latter as beneficiary, and the other, a trust for management by his selected Board of Trustees. The latter trust, as we have seen, was enforceable for the benefit of the public by the City. The plan was evidently well thought out and has worked beneficially for the people of Baltimore as has been demonstrated by sixty years of history. Moreover the state and city legislation constituted a valid contract between Mr. Pratt and the city which may not be impaired by subsequent state and city Acts, under the provisions of the federal Constitution, Art. 1, § 10.

 While the question under consideration must be resolved by the federal courts, as a federal question, the Maryland decisions are very persuasive authority that the nature of the Library Corporation with respect to its internal management by the Board is private and not public. The legal test between a private and public corporation is whether the corporation is subject to control by public authority, state or municipal. To make the corporation a public one, its managers, whether trustees or directors, must be not only appointed by public authority but *subject to its control*. This has been the Maryland law since the early case of Regents of University of Maryland v. Williams, 9 Gill & J., Md., 365, 31 Am.Dec. 72 (dealing with the University of Maryland prior to its reorganization in 1920 when it became for the first time a governmental institution), and in the similar well known case of Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 671, 4 L.Ed. 629, it was said:

"When [a] corporation is said at the bar to be public, it is not merely meant, that the whole community may be proper objects of the bounty, but that the government have the sole right, as trustees of the public interest to regulate, control, and direct the corporation, and its funds, and its

franchises at its own good will and pleasure."

And this test has been reaffirmed and applied in subsequent cases. St. Mary's Industrial School v. Brown, 45 Md. 310; Clark v. Maryland Institute, 87 Md. 643, 41 A. 126; Finan v. City of Cumberland, 154 Md. 563, 141 A. 269; University of Maryland v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R. 706 (dealing with the University of Maryland after its reorganization in 1920), and the general law on the subject is to the same effect. 18 C.J.S., Corporations, § 18, p. 394 et seq.; Fletcher, Cyc. Corp. Vol. I, p. 194 et seq.; Board of Trustees v. Indiana, 14 How. 268, 276, 14 L.Ed. 416; Providence Engineering Corp. v. Downey Shipbuilding Corp., 2 Cir., 294 F. 641; Van Campen v. Olean Gen. Hosp., 210 App.Div. 204, 205 N.Y.S. 554.

■ There is nothing in the Acts of the Legislature of the State of Maryland or the Ordinances of Baltimore City relating to the Pratt Library to indicate any reserved right of control by the State or City in the management of the Library so long as its maintenance fund is used for the general purpose for which it was created. I do not understand counsel for the plaintiffs to control that the State has itself directly reserved any such control in the Act creating the Library Corporation. The purpose and effect of the Act was merely to ratify and approve the agreement made between Mr. Pratt and the City and to give the necessary authority of the State to the City to carry out the agreement. While it would doubtless be competent for the State to create and maintain a public library corporation as a feature of public education, clearly the State has not undertaken to do so in this case. It has never contributed any money or property to the Library; nor so far as I am aware, has it ever maintained any public library for general educational purposes or otherwise than for the benefit of the state government itself. See Maryland Code, Art. 41, § 106 et seq. In Maryland it is the county or city which is the political unit charged primarily with responsibility for public education, including the maintenance of public libraries. Mills v. Lowndes, D.C.Md., 26 F.Supp. 792; Mills v. Board of Education of Anne Arundel County, D.C.Md., 30 F.Supp. 245; Md.Code, Art. 77, §§ 162, 168 et seq. While Baltimore City has been authorized by the Legislature to make contributions to the Enoch Pratt Free Library, and to other libraries, [See Baltimore City Charter and Public Local Laws 1938 s. 6(14a)], the Pratt Library is not within the Department of Education of the City. This will readily appear from a comparison of the general provisions of the City Charter relating to the Department of Education (section 128, et seq.) with the separate provisions therein relating to the Pratt Library [ss. 969–971, and 6(14a)].

It is also very clear from the evidence in this case (see particularly the testimony of Mr. Fallin, Budget Director of Baltimore City for many years) that the City has never considered that it had any legal authority to control the internal management of the Library by its Board of Trustees; and has in fact never sought to exercise any such control. On the contrary when in 1934 a similar contention to that now advanced on behalf of the plaintiff was presented to the Mayor and referred by him to the City Solicitor, Mr. R. E. Lee Marshall, the then City Solicitor, gave an extended written opinion that the City had no legal right whatever to interfere with the internal management of the Library Corporation. After reviewing the applicable legislation Mr. Marshall's opinion succinctly summarized the matter as follows:

"As appears by the foregoing, the Library Corporation is a private Corporation insofar as the management and direction of its internal business and affairs are concerned. The fact that it is a quasi-public Corporation in all other respects does not change, or affect, its character as a private Corporation in matters relating to its internal management."

■ The argument most stressed by counsel for the plaintiff is that Baltimore City has practical economic control over the Library by virtue of its large voluntary appropriations. But with this question the court is not concerned as the problem must be resolved on the basis of the legal right to control and not possible practical control through withholding appropriations. The latter is obviously a matter of policy for the City Authorities who are responsible to the suffrages of the voters of the City in that and other respects. Although the amount of voluntary appropriations by the City are now much larger than the guaranteed annual income for

maintenance created under the agreement with Mr. Pratt, it is very clear from the Maryland cases that these voluntary appropriations, no matter how large comparatively, cannot affect the legal question as to where control lies in the internal management of the corporation. In the University of Maryland case, 9 Gill & J. 398, 31 Am.Dec. 72, above referred to, it was said in speaking of the character of the corporation there involved:

"If eleemosynary and private at first, no subsequent endowment of it by the state, could change its character, and make it public."

Private charitable corporations in Maryland are not made public agencies as a result of public appropriations for their benefit, but when such appropriations are made by a city or county in Maryland, there must be State legislative authority therefor. St. Mary's Industrial School v. Brown, 45 Md. 310; Finan v. City of Cumberland, 154 Md. 563, 141 A. 269. It has long been the practice in Maryland for the State itself to make very substantial appropriations to private charitable corporations. For illustration, see Maryland Acts of 1943, c. 710, p. 1104 et seq.

When in 1927 Baltimore City sought to condemn property for the new Library site and building as heretofore recounted, some of the affected property owners resisted the condemnation on the ground that it was the expressed purpose of the City to turn over the property when acquired for the use of the Enoch Pratt Library as a *private* corporation. In that case (Johnson v. Baltimore, 158 Md. 93, 148 A. 209, 66 A.L.R. 1488) the Court of Appeals held that the condemnation was valid as the City had authority to acquire land for library purposes which was a public use and therefore the interposed defense was not valid; and the Court did not find it necessary to adjudicate the question whether the Library Corporation was private or public, it being said that if there was foundation in fact for the contention that the City had no authority to turn over the property to a private corporation, that question could be subsequently raised in an appropriate proceeding. So far as I know there was no further contest in the matter.

It is argued that if the Library Corporation is held to be private and not public the Trustees could discriminate in the quality and quantity of free library services to the public between the white and colored races; but there is no tenable basis for this view. In Mr. Pratt's original letter of January 21, 1882, he said—"I have for some years contemplated establishing a Free Circulating Library *for the benefit of our whole City.*" (Italics supplied) And in the Enabling Act of 1882 it was recited in the preamble, "And Whereas, the plan thus proposed offers the means of perpetually promoting and diffusing knowledge and education among the people of the City of Baltimore". While the internal management of the corporation, including appointment of necessary officers and agents, was fully committed to Mr. Pratt's personally selected Trustees, it was further provided in section 3 of the Enabling Act that the City should have a right to appoint a Visitor "who shall as often as once a year examine the books and accounts of said Trustees and make a report thereof to the Mayor and City Council of Baltimore; and said Mayor and City Council shall, in case of any abuse of their powers by said Trustees or their successors, have the right to resort to the proper courts to enforce the performance of the trusts hereby imposed on them." As a matter of fact it fully appears from the evidence in this case that the Trustees have been at all times highly sensible of the broad scope of their duties with respect to public services to the whole people of the City, and there has always been full and equal library facilities of all kinds offered to and availed of by the whole public without discrimination between classes or on account of race or color. Any one familiar with Baltimore City in the 80's would at once recognize the names of the Trustees selected by Mr. Pratt as outstanding citizens of Baltimore and men of the highest character, as may also be said of their successors now in office.[2]

The necessary conclusion of law is that in the appointment of Assistant Librarians and other agents and employes of the Library the Trustees have the right of selection without the restraints of the 14th

---

[2] In a letter dated October 1, 1884, from Mr. Pratt to the Trustees, after referring to the completion of the main Library building and four branches, he said:

"These, I think, are all accessible to the people, who, I hope, will avail of the advantages it is my wish to offer them, they being all, rich and poor, without distinction of race or color, who when prop-

Amendment or the federal statutes relied upon by the plaintiff in this case. And it results that the plaintiff's complaint must be dismissed.

There is an additional feature of the case that must be noticed. T. Henderson Kerr, the father of the plaintiff Louise Kerr, has also been joined as a party plaintiff in the case, and in the fourth count of the complaint, he advances the proposition that if the Library Corporation is not a public one, the action of the City in making voluntary appropriations for the Library from funds resulting from the general tax levy, is *ultra vires* and without due process of law to the injury and prejudice of himself as a substantial taxpayer, and therefore in alleged violation of the 14th Amendment of the federal Constitution in that phrase of section 1, which provides "nor shall any State deprive any person of life, liberty, or property, without due process of law;." The relief prayed for is an injunction against the City "from transferring to the Enoch Pratt Free Library of Baltimore, if a private corporation as aforesaid, any public moneys derived in part out of taxes levied against him in excess of $100,000, annually." This relief is asked for only in the alternative, that is, on the condition that the court finds that the Library Corporation is a private and not a public corporation, and therefore if the plaintiff, Louise Kerr, is not entitled to the relief that she claims. The defendants ask for a dismissal of this fourth count of the complaint because (1) there is a misjoinder of plaintiffs and also of the defendants (as to the Mayor and City Council of Baltimore); (2) for lack of jurisdiction because there is no diversity of citizenship and no federal question substantially or sufficiently alleged, or (3) on the legal merits, in that the evidence does not show any lack of due process.

■ As to the alleged misjoinder of parties, the question is controlled by rules 20 and 21 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. By rule 21, even if there is a misjoinder of parties, that is not a ground for dismissal of the whole action; but parties may be dropped by order of court on motion of any party or by the court on its own initiative at any stage of the action and on such terms as are just, and any claim against a party may be severed and proceeded with separately. Rule 20 deals with permissive joinder of parties, and one of the conditions is "if any question of law or fact common to all of them will arise in the action." The derivation of this rule is fully explained in Moore's Federal Practice, Vol. II, pp. 2164, et seq. The rule also provides in section (b) that the court may order separate trials to prevent embarrassment or delay or unnecessary expense occasioned by the inclusion of a party, or may order separate trials or make other orders to prevent delay or prejudice. The rule should doubtless be liberally interpreted and applied in practice when consistent with convenience in disposition of litigation. Nevertheless it may be debatable whether there is or is not, strictly speaking, a misjoinder of parties in this case. It is obvious that the plaintiff, Louise Kerr, has no interest in the fourth count of the complaint, and likewise the plaintiff, T. Henderson Kerr, has no interest in the first, second and third counts of the complaint, except insofar as a determination with respect thereto adverse to Louise Kerr may give rise to a right of action by T. Henderson Kerr, against the defendant, the Mayor and City Council of Baltimore, in which event the other defendants are not directly interested. However, as the main purpose of these two rules is for convenience in disposition of litigation and as the whole matter has been covered in the trial and argument, it seems unnecessary at this stage of the case to order separate trials or make other orders not dispositive of the whole case, by reason of the alleged misjoinder.

■ With respect to the point of jurisdiction, in the absence of any diversity of citizenship, the only basis for jurisdiction is the charge that the public moneys contributed by a taxpayer are being expended by the City without authority and therefore without due process of law as to him. The only factual basis alleged for this legal conclusion, that the City is without authority to make appropriations for the benefit of the Library Corporation, is, as has been determined heretofore in this opinion, the corporation is a private one and not performing governmental func-

---

erly accredited can take out the books, if they will handle them carefully and return them. * * * I now hand the management over to you, not doubting you will make all proper arrangements to carry out my wishes and make the Institution what I wish for the people of Baltimore and State of Maryland."

tions as representative of the State. It is urged by the defendants that this question is really one of state rather than federal law, and in the absence of diversity of citizenship the court has no proper jurisdiction to determine it. And it may be argued that even if the federal question is literally alleged to exist it is unsubstantial. If this view is adopted the proper course would be to dismiss the count without prejudice. I should personally prefer to make that disposition of the fourth count as the matter is basically one of state law; but as a federal question is formally alleged and counsel for the plaintiff insists that the court does have jurisdiction, it seems necessary to consider the fourth count in that aspect.[3]

So considered, I find no legal merit in the plaintiff's contention. By the Maryland law Baltimore City and the Counties, as municipal corporations of the State, may not validly make appropriations from public moneys for the benefit of private corporations unless duly authorized by the State Legislature, but when so authorized such appropriations when made to private corporations performing charitable functions are valid. St. Mary's School v. Brown, 45 Md. 310; Finan v. City of Cumberland, 154 Md. 563, 141 A. 269. As has been pointed out above the Maryland Legislature has expressly authorized Baltimore City to make appropriations to the Enoch Pratt Free Library [Baltimore City Charter 1938, § 6(14a)]. It is obvious that the action of the City is not *ultra vires*. No provision of the Maryland Constitution is referred to by counsel, and none is known to the court, that would make the legislative authority invalid. Nor have counsel for the plaintiff cited any federal author-

ity for the proposition that the voluntary appropriations by the City take the plaintiff's property without due process. It results that the fourth count of the complaint must be dismissed generally.

Counsel may submit the appropriate judgment in due course.

---

[3] By the Act of Congress of 1937, c. 726, an additional sentence was added to what is now 28 U.S.C.A. § 41(1) reading as follows:

"Notwithstanding the foregoing provisions of this paragraph, no district court shall have jurisdiction of any suit to enjoin, suspend, or restrain the assessment, levy, or collection of any tax imposed by or pursuant to the laws of any state, where a plain, speedy and efficient remedy may be had at law or in equity in the courts of such State."

There is no doubt that the State law and practice includes a plain, speedy and efficient remedy in the Maryland courts in the instant case; but otherwise this prohibition of jurisdiction does not seem to include plaintiff's case as here stated because he is not attacking any present or future assessments or collection of taxes, but the paying over of tax moneys heretofore or hereafter collected, to the Library Corporation over and above the contractually guaranteed sum. Therefore even though liberally construed, as I think it should be, this particular statutory provision seems not applicable here. Cf. Sears, Roebuck & Co. v. Roddewig, D.C.Iowa, 24 F.Supp. 321. As a preliminary injunction was not prayed for by the plaintiff, 28 U.S.C.A. § 380, which requires a three-judge federal court in certain proceedings to enjoin the enforcement of state statutes, also seems inapplicable.