REGAN, Judge.
Plaintiffs, the Audubon Park Commission and the Audubon Park Natatorium, Inc., *575 instituted this suit to enjoin the Board of Commissioners for the Port of New Orleans from continuing construction of public wharves and dock facilities on that part of the batture which forms a portion of property designated as the Mengel Tract, of which Audubon Park Natatorium is the record owner. Plaintiffs explained therein that the defendant, as a state agency, cannot acquire a servitude on this property, since the Natatorium purchased it for the State, and in addition thereto, that the property has been dedicated for park purposes and may not now be used for a purpose inconsistent therewith.
The defendant pleaded innumerable exceptions ; however, no useful purpose would be served by engaging in a discussion thereof, herein. In any event, these exceptions were disposed of, and it then answered, admitting that it had begun construction of dock facilities at the river edge of the Mengel Tract, and denied all of the other allegations of plaintiffs’ petition. It also especially pleaded the doctrine of estoppel, insisting that laches have intervened and effectively barred plaintiffs’ right to request equitable relief, in view of the fact that the alleged trespass of which they now complain has existed for a period of seven years, and that the plaintiffs were fully cognizant thereof. Thus, having created and enjoyed the benefits which were achieved through a private business corporation, the plaintiffs are now estopped from asserting that such a corporation was nonexistent.
From a judgment denying injunctive relief, the plaintiffs have prosecuted this appeal.
The only question which this appeal has posed for our consideration is whether the Mengel Tract is privately owned, that is, by the Audubon Park Natatorium, Inc., or is owned by the State of Louisiana, through the Natatorium and the Audubon Park Commission. The litigants concede that the Dock Board is entitled to its servitude if we decide that the property is privately owned.
Plaintiffs have endeavored to prove ownership in the State by either of two' methods: (1) By proving that the Audubon Park Natatorium, Inc., in effect, is an agency of the State; therefore, title registered in its name is tantamount to title being vested directly in the State; or (2) By showing that the Mengel Tract has been informally dedicated for park purposes by its owner, in permitting the Audubon Park Commission to use the tract in expanding public facilities which, before its acquisition, were confined to the property designated as Audubon Park.
We shall hereinafter, for the purposes of both clarity and brevity, refer to the Audubon Park Commission as the Commission, the Audubon Park Natatorium as the Nata-torium, and the Board of Commissioners for the Port of New Orleans as the Dock Board.
The record reveals that the Natatorium purchased the Mengel Tract in March 1949 from the Texas & Pacific Railroad for a consideration of $125,000.00. The property conveyed is bounded by Tchoupitoulas Street, Henry Clay Avenue, the Mississippi River and Audubon Park. With respect to the Audubon Park property, owned outright by the State, it is adjacent thereto on the downstream side line.
Plaintiffs initially contend that the State owns the Mengel Tract, in view of the fact that all of the Natatorium stock is owned by the Commission, a state agency created to regulate, improve and maintain the Audubon Park. They rely on the rationale of our decision in the first Audubon Park case,[1] which pronounced that the Dock Board’s servitude on the batture at the edge of Audubon Park proper, was extinguished by confusion when the State acquired the Park property in fee simple.
*576 Defendant, conversely, insists that the Mengel Tract is privately owned since the Natatorium was incorporated, and has since functioned as a private, as distinguished from a public or political corporation.
In order to determine the character and legal classification of this entity, the Nata-torium, we find it expedient to review the origin and subsequent conduct of both plaintiff corporations
The Commission owes its existence to the legislature, having been created by virtue of Act 191 of 1914 for the purpose of managing Audubon Park, a public recreational facility owned by the State.[2] The Commission is composed of 24 citizens of the City of New Orleans, who are appointed by the Mayor thereof.
Its powers are enumerated therein as follows:
“Section 5. Be it further enacted, etc., That the said Commissioners shall have the power to select a secretary and to fix his salary at a reasonable sum and likewise to employ such other agents and employees as may be required for the discharge of its functions. The Commission shall make rules fixing its own meetings and procedures, and shall have authority to make and establish such police regulations and ordinances for the preservation of order and the protection of property in the Park under its control, and to provide penalties for the breach thereof by fine and imprisonment.”
Authority to raise revenues for the Park’s •expansion was not vested in the Commission. Instead, the financial supervision of funds to be used for park purposes was vested in the City of New Orleans. The foregoing statements are substantiated by the terminology of the act, which reads in part:
“Section 6. Be it further enacted, etc., That the City of New Orleans is hereby authorized, empowered and directed, upon the request of the Audubon Park Commission, to issue bonds to an amount not exceeding One Hundred Thousand Dollars ($100,000) * * *"
“Section 7. Be it further enacted, etc., That the proceeds of the sale of the bonds herein provided for, shall be deposited by the Board of Liquidation of the City Debt with the Fiscal Agent of the City of New Orleans to the credit of a special fund called the ‘Audubon Park Fund.’ Such proceeds shall be disbursed by the Audubon Park Commission in the discharge of its functions * * (Emphasis added)
It is, therefore obvious that the Commission was created as an agency of the State, whose only functions were to manage and improve a State-owned park.
The Natatorium was organized in September 1927 in conformity with the provisions of Act 267 of 1914, the statute then in force relating to the organization of private business corporations.
Its charter reveals that it was created to lease and operate the swimming pool and concessions in Audubon Park and, among other things, to purchase and.convey property necessary or desirable for the purpose of operating park concessions.
The Commission, in consideration of leasing to the Natatorium various park concessions, received 100 shares of its common stock of no par value.
Private individuals subscribed to 500 shares of preferred stock; however, the charter reserved to the common stockholder, that is, the Commission, the right to redeem, at will, all of the preferred stock.
The Natatorium in the course of time did redeem the outstanding preferred stock, by *577 issuing interest bearing promissory notes to the holders for the value thereof.
The Natatorium charter provided that it was to be operated by a Board of Directors composed of nine men, seven of whom were to be appointed by the common stockholders. Therefore, from its inception, the Commission possessed the power to control the operation of the Natatorium. This control became absolute when the Natatorium subsequently retired the preferred stock which vested sole ownership of the Natatorium in the Commission.
Both corporations maintained separate minutes of meetings; however, the record reveals that the Commission and the Nata-torium were controlled by the same persons, since a majority of the Commission’s board also served and formed a majority of the Natatorium’s directorate.
The Natatorium has functioned primarily as a purchasing agent for the Commission, and has always acted at the instigation of the Commission. This is clearly evidenced by the plaintiffs’ action in acquiring the Mengel Tract, the land which forms the subject matter of this dispute.
The minutes of the Commission reflect that it was this public corporation which conducted the negotiations with the officials of the Texas & Pacific Railroad for the purchase of the land. Following four years of negotiation, the property was transferred to and registered in the name of the Natatorium corporation.
There exists no doubt that the Commission actually created the Natatorium for the purpose of attaining objectives, through its use of that corporation, which it was not authorized nor permitted to accomplish as a public corporation. This intention is emphasized from the fact that the Commission retained in itself control of the Natatorium from the very inception of its existence, and the right to subsequently own the corporation in toto. We must conclude that the foregoing actions of the Commission were ultra vires, since they were beyond the powers conferred upon the Commission by the act of the legislature.
Despite the fact that we have concluded that the Commission exceeded its scope of authority in creating this private corporate entity, that is, the Natatorium, we are of the opinion that, in functioning through the Natatorium, the Commission did not commit any acts which were, per se, illegal, contra bonos mores or which were prohibited by positive law. In fact, its actions, and fortunately so, were, from the public standpoint, even praiseworthy.

It therefore follows that while the in-corporators of the Natatorium lacked capacity or authority to incorporate, nonetheless, a corporation was created which does enjoy, even if precariously, a de facto existence.

In 8 Fletcher Cyclopedia Corporations, Ch. 45, Sec. 3761, a de facto corporation is defined as follows:
“A de facto corporation may be defined as one so defectively created as not to be a de jure corporation, but nevertheless the result of a bona fide attempt to incorporate under existing statutory authority, coupled with the exercise of corporate powers, and recognized by courts as such upon the ground of public policy in all proceedings except a direct attack by the state questioning its corporate existence.” (Emphasis ours)
A de facto corporation enjoys all the powers of a corporation de jure. In 18 C.J.S. verbo, Corporations § 95, p. 491, this subj ect is discussed as follows:
“It is a general rule that, except as against the state, a de facto corporation has all the powers, liabilities, and duties of a corporation de jure. Thus, where there is a corporation de facto, the legality of its existence cannot be attacked collaterally for the purpose of questioning its right to sue or to de *578 fend; its right generally to carry on the business for which it was created or organized and to exercise the powers granted by its charter or articles of incorporation ; its right or title to real or personal property conveyed to it or otherwise acquired by it.” (Emphasis ours)
We are relatively sure that the Attorney General of the State of Louisiana could inquire into the legality of the Natatorium’s corporate existence and the use by the Commission of this entity to purchase real estate; however, no action in connection therewith has been initiated by the State. Thus, the Natatorium, as we have said, does enjoy, even if precariously, a de facto status, in which capacity it is entitled to acquire property.
The foregoing conclusion is supported by the rationale appearing in a case entitled Nelson v. Texas & P. Ry. Co.,[3] wherein the Supreme Court expressed itself as follows:
“Nor do we believe that plaintiffs have any right to challenge the authority of the Texas & Pacific Railway Company to operate oil and gas wells upon its right of way on the ground that such authority is beyond its charter powers. It was expressly held by this court in the case of Southern Lumber Co. v. Holt, 129 La. 274, 55 South. 986, that the ultra vires acts of a corporation can be questioned only by a person directly interested in the corporation or by the sovereignty which has granted the charter to the corporation. * * * No one has the right to question the right of a railroad corporation to hold real estate, except the sovereign. ■* * *” (Emphasis ours )
Plaving decided that the Natatorium does enjoy a de facto existence, we are now relegated to a consideration of whether it is a public or a private corporation.
In connection therewith, the record reveals that the Natatorium was incorporated and has functioned for thirty years as a private business corporation. It has not been subject to governmental supervision or control, other than that which has been exercised by the Commission.
The funds which it used to purchase the Mengel Tract were raised therefor by obtaining loans from private individuals, who were given mortgages by the corporation as security therefor.
In 1952, the Natatorium conveyed a portion of the Mengel Tract to the City of New Orleans, upon which this municipality erected the Crippled Children’s Hospital. Prior to the sale, the Natatorium did not advertise its intention to sell the property, nor did it obtain bids thereon, which, of course, is required of a public corporation. In other words, the Natatorium sold this property in the same manner that a private corporation would dispose of its real estate.[4]
In addition, the Commission permitted private individuals to remove river sand from the batture along the Mengel Tract, and the funds derived from the sales thereof were deposited in a special Natatorium account reserved for revenues which emanated from the Mengel Tract. These revenues were dedicated to repaying the loans secured by mortgages. The Natatorium operated for a profit and on one occasion it even paid a dividend to stockholders.
Now, after having functioned as a private corporation for more than 30 years, the *579 Natatorium assumes the nebulous position that it is a public or political corporation and an agency of the State, since the public at large has been the sole recipient of its beneficent operations.
In support of this contention, the plaintiffs rely upon the rationale of LSA-C.C. Art. 429 which reads:
“Corporations are of two principal kinds; political and private.
“Political corporations are those which have principally for their object the administration of a portion of the State, and to whom a part of the powers of government is delegated to that effect.
“All others are private corporations.”
It is true that the Natatorium operated various park concessions from which the public has benefitted and that these concessions could conceivably be considered a “portion of the State”. However, the Natatorium does not meet the severe test of being an entity “to whom a part of the powers of government is delegated to that effect”. There is no legislative sanction or authorization for the Natatorium’s conduct. Even if we were to assume arguendo that the State’s silence relative to the use of the Natatorium for various functions of the Commission amounted to an implied delegation of authority, we would still be unable to extend that reasoning to encompass the acquisition of the Mengel Tract, since the Commission explicitly did not possess the legislative authority to buy and sell real estate.
Were we to imply a delegation of power from the State by virtue of the Commission’s actions, we would reach an absurd result such as would permit a public corporation or agency to delegate powers to a private corporation in excess of those initially granted to the public corporation by the legislature, and, therefore, in this respect, the will of the legislature would either be nullified or destroyed.
We think the decision in Kerr v. Enoch Pratt Free Library[5] also supports the conclusion that the Natatorium is a private corporation. In that case, a colored woman, who was refused admission to a training class for librarians, conducted by the Board of Trustees of the Library, complained that the board deprived her of her constitutional guaranty to equal protection of laws. The court therein recognized that her complaint would have been valid if the Board were a public corporation.
The librarians who were accepted for training were required to serve for a minimum period in the Enoch Pratt Free Library system upon successfully completing the course. The library system was originated by Enoch Pratt, who donated a library to the City of Baltimore. The Maryland Legislature passed an act authorizing the City of Baltimore to accept this donation and to provide a percentage of city funds annually for its maintenance and operation.
Although the library was operated exclusively for the public at large, the court held that the Board, established for the internal management of the library, was a private corporation. It stated the following criterion which it used in characterizing the corporation:
“ * * * The legal test between a private and public corporation is whether the corporation is subject to control by public authority, state or municipal. To make the corporation a public one, its managers, whether trustees or directors, must be not only appointed by public authority, but subject to its control. * *
While we are fully cognizant of the fact that the Natatorium has generally functioned in the interest of the public, nonetheless it is not subject to State or Municipal con *580 trol nor can it be dissolved by the legislature. We are convinced that the Natatorium must be subject directly to governmental control in order to enjoy the status of a public corporation.
Therefore, we are of the opinion that the Mengel Tract is owned by a de facto private corporation, which subjects the land to a servitude in favor of the Dock Board so that it can expand port facilities thereon.
Plaintiffs finally contend that the Mengel Tract has been dedicated for public purposes by virtue of the expansion of recreational facilities into this area, and this informal dedication vested the ownership of the land in the public domain of the State. They also argue that the Dock Board’s taking of the batture area is for a purpose inconsistent with that for which it has already been dedicated.
We need not pass on the validity of this contention since the record clearly reveals that the land in dispute has not been dedicated for park purposes.
While the Mengel Tract is usually referred to as a single area, it is composed of two separate parcels of land, which are not contiguous to each other. They are divided by a strip of land 110 feet wide, on which four railroad tracks are laid. The strip was acquired in fee simple in 1901 by the City of New Orleans by a judgment of expropriation [6] against the Texas and Pacific Railway Company, the Natatorium’s ancestor in title. This area is referred to as Leake Avenue.
The larger portion of the Mengel Tract is bounded by Tchoupitoulas Street, Henry Clay Avenue, the St. Charles Avenue side boundary of Leake Avenue and Audubon Park. The smaller tract is bounded by the riverward boundary of Leake Avenue, an extension of Henry Clay Avenue, the Mississippi River and Audubon Park.
Although the Commission has used the larger parcel of the Mengel Tract for park purposes, there has been no park activity on the smaller area or the tract upon which the Dock Board is presently constructing dock facilities.
Therefore, to reiterate, we need not consider whether there is any merit in plaintiffs’ argument relative to the subject of dedication since we find as a fact that the affected land area has not been dedicated for park purposes.
In view of what we have said hereinabove, we are compelled to conclude that the Dock Board has a right of servitude on that portion of the Mengel Tract that borders the Mississippi River for the construction of port facilities. This is so because the entity to which the servitude is due is separate from the one in which fee simple title is vested.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.

. City of New Orleans v. Board of Commissioners, La.App., 148 So.2d 782, (1962). Writs refused April 11, 1963.

. City of New Orleans v. Board of Commissioners, La.App., 148 So.2d 782, (1962). Writs refused April 11, 1963.

. 152 La. 117, 92 So. 754.

. 7 Fletcher Cyclopedia Corporations, Ch. 40, Sec. 3500 states:
“If a corporation enters into an ultra vires contract to purchase property, real or personal, and the contract is fully performed by payment and a conveyance or transfer of the title, the effect of the transaction is to vest the title in the corporation, at least as against all persons but the state, and the corporation may afterwards sell the same. The other party cannot, in such a case, maintain a suit to rescind the sale and recover the property, nor can ultra vires be set up either by the corporation purchaser or grantee or by a third person who is a stranger to the transaction.”

. 54 F.Supp. 514 (D.C.1944).

. Proceedings No. 65-305 of the Civil District Court for the Parish of Orleans.